## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

RGF ENVIRONMENTAL GROUP,
INC., a Florida corporation,

**08-CV-80682-Dimitrouleas-Rosenbaum**

        Plaintiff,

v.

ACTIV TEK ENVIRONMENTAL
CORPORATION, a foreign corporation,
ECOQUEST INTERNATIONAL, INC.,
a foreign corporation, and MICHAEL
JACKSON,

        Defendants.

_____/

FILED by _VT_ D.C.
ELECTRONIC

**JUNE 20, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

### VERIFIED COMPLAINT

Plaintiff RGF ENVIRONMENTAL GROUP, INC. ("RGF"), hereby sues Defendants, ACTIV TEK ENVIRONMENTAL CORPORATION ("ActivTek"), ECOQUEST INTERNATIONAL, INC. ("EcoQuest"), and MICHAEL JACKSON ("Jackson") (collectively the "Defendants"), on the following causes of action and alleges:

### Jurisdiction, Parties & Venue

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), because this is an action for copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et. seq.*

2.    This Court also has diversity jurisdiction under 28 U.S.C. § 1332, because this case is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

3.    Venue is proper in this district under 28 U.S.C. § 1400(a) and 28 U.S.C. § 1391(b), because Jackson has a residence and may be located in Palm Beach County, Florida,

EcoQuest and ActivTek transact and solicit business within this District, and a substantial part of the events giving rise to the claim occurred within this District.

4.     Plaintiff RGF is a Florida corporation with its principal place of business in Palm Beach County, Florida.

5.     Defendant ActivTek is a foreign corporation organized under the laws of the State of Tennessee, with its principal place of business in Greeneville, Tennessee.

6.     Defendant EcoQuest is a foreign corporation organized under the laws of the State of Tennessee, with its principal place of business in Greeneville, Tennessee.

7.     ActivTek is a wholly-owned subsidiary of EcoQuest.

8.     Defendant Jackson is an individual, who is the President, Chief Executive Officer, and majority shareholder of EcoQuest and ActivTek, and he maintains a residence in Singer Island, Palm Beach County, Florida.

## General Allegations

9.     In or about April 2004, EcoQuest approached RGF to discuss RGF's ability to design swiftly and to sell to EcoQuest a new air purification system that EcoQuest could then resell through its multi-level distributor program.

10.     EcoQuest also inquired about purchasing from RGF rights to manufacture and sell certain air purification product designs and trademarks based upon the work of the President of RGF, Ron Fink.  EcoQuest believed that these products would avoid future Federal Trade Commission prosecution, to which it had previously been subjected due outdated technology and unsubstantiated claims.

**A.     Negotiations & Execution of Asset Purchase and Sale Agreement**

11.     During the months of April, May and June 2004, numerous telephone conferences and meetings occurred to discuss the agreement and strategic relationship for EcoQuest and RGF

2

going forward.  A draft agreement was created and numerous drafts were exchanged between the parties.

12.     In June 2004, RGF and EcoQuest entered into an Asset Purchase and Sale Agreement ("APSA"), a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "A."**

13.     Under the APSA, RGF sold to EcoQuest intellectual property assets that included two (2) pending trademarks, propriety invention records and disclosure for Radiant Catalytic Ionization ("RCI") technology, a list of nine (9) pre-existing RGF product designs/inventions to be converted to incorporate RCI technology, and a list of five (5) pre-existing propriety RGF products/inventions not containing RCI technology.  (APSA at ¶ 2.1(a)).

14.     In addition, RGF also agreed to offer certain certification courses to EcoQuest's distributors.

**B.     Development and Sale of the Home Study Course**

15.     As early as 2001, RFG has developed, authored and distributed for sale an Advanced Oxidation Technology Self Study Training Program (hereinafter the "Home Study Course").  This program was outside the scope of and separate and apart from the APSA.

16.     In or about 2004 and 2005, EcoQuest requested that RGF modify the Home Study Course for EcoQuest to sell to distributors, and EcoQuest agreed to pay RGF a fifteen dollar ($15.00) royalty per program sold.  RGF revised its Home Study Course accordingly.

17.     EcoQuest paid RGF the agreed upon royalties for the Home Study Course sales from October 2004 through June 2005, but no royalties have been paid since.

18.     Upon information and belief, EcoQuest has continued to sell the Home Study Course to its distributors, and, as of January 2008, is offering it to distributors through ActivTek. Attached hereto and incorporated herein as **Composite Exhibit "B"** is an ActivTek Welcome

3

Letter and Highlights of Business Strategy, which lists the same Home Study Course being offered to distributors, as well as an Internet search result from March 20, 2008, for EcoQuest sites listing the availability of the Commercial Training Course.

19.    Although Defendants have made minor changes to the test that is given with the Home Study Course, upon information and belief, the text of the training program is substantially similar, if not identical, to the RGF's Home Study Course materials and/or the revised Home Study Course.

20.    RGF received a Federal registration for its copyright in its Home Study Course. RGF also received a Federal registration for its copyright in the revised course developed for EcoQuest.  True and correct copies of RGF's Certificates of Registration for its copyrights are attached hereto as **Exhibit "C."**

21.    RGF currently and at all times relevant has been the sole owner of all right, title and interest in and to all copyrights to all versions of the Home Study Course.

**C.    Development and Sale of the Commercial Training Course**

22.    During the same period, RGF and EcoQuest agreed that RGF would abandon its Commercial Distributor Air Program, which was then run by Rick Hill at RFG.   As consideration for abandoning that program, RGF agreed to develop a Commercial Training Course that would be presented live by RGF employees, along with Rick Hill who had been hired away from RGF by EcoQuest to promote the commercial product line.

23.    RGF and EcoQuest agreed that they would equally share in the net profits for the Commercial Training Courses.

24.    Several Commercial Training Courses occurred during 2005, wherein both RGF and EcoQuest participated, and RGF's specially developed training materials were used.

4

25.     EcoQuest sent RGF an accounting of the net profits derived from the three training courses held in January, March and April 2005, and EcoQuest paid RGF half of the net profits, as agreed.

26.     EcoQuest, however, never notified RGF of any Commercial Training Courses after that time, and, upon information and belief, EcoQuest, and now ActivTek, have held many Commercial Training Courses without including RGF employees, or without paying RGF its share of the net profits, as agreed.

## COUNT I: COPYRIGHT INFRINGEMENT
### (Direct Infringement Against EcoQuest & ActivTek)

27.     RGF incorporates herein by reference the allegations in Paragraphs 1 through 21 above, as if fully set forth herein.

28.     RGF owns copyrighted material that is used and sold as the Home Study Course.

29.     RGF authorized EcoQuest to sell and distribute the Home Study Course in exchange for payment of royalties for each course sold.

30.     RGF has not received royalty payments from EcoQuest since June 2005.

31.     RGF did not authorize ActivTek to sell and distribute the Home Study Course.

32.     On information and belief, EcoQuest and ActivTek have copied, sold and distributed RGF's Home Study Course since June 2005 without authorization and without paying RGF any royalties.

33.     EcoQuest and ActivTek's conduct constitute a willful infringement of RGF's copyrights in the Home Study Course within the meaning of 17 U.S.C. § 504(c)(2).

34.     RGF has no adequate remedy at law.

35.     By reason of the foregoing facts, RGF is entitled to injunctive and monetary relief against Defendants EcoQuest and ActivTek.

WHEREFORE, Plaintiff RGF Environmental Group, Inc., prays this Court to grant the following relief against Defendant EcoQuest International, Inc. and ActivTek, Inc.:

(a)     That Defendants, EcoQuest and ActivTek, their agents, employees, successors, assigns, and all other persons acting in concert with or affiliated with them, be permanently enjoined and restrained from copying, reproducing, manufacturing, duplicating, disseminating, distributing, or otherwise using any unauthorized copies of the Home Study Course that is the subject of this Complaint, and from otherwise infringing RGF's copyrights in said product;

(b)     That Defendants, EcoQuest and ActivTek, be ordered to file, within thirty (30) days of the issuance of the injunction, a sworn report setting forth in detail the manner in which they have complied with the injunction;

(c)     That Defendants, EcoQuest and ActivTek, be ordered to conduct an accounting of all profits derived from making, using, marketing or selling unlicensed copies of the Home Study Course that is the subject of this Complaint;

(d)     That RGF be awarded its actual damages for the willful infringement of the Home Study Course by Defendants, EcoQuest and ActivTek; and

(e)     That RGF be awarded such other and further relief as this Court deems just and proper.

## COUNT II: COPYRIGHT INFRINGEMENT
### (Direct and Contributory Infringement Against Jackson)

36.     RGF incorporates herein by reference the allegations in Paragraphs 1 through 21 and Paragraphs 28 through 35 above, as if fully set forth herein.

6

37.     Jackson, as the President and Chief Executive Officer of EcoQuest and ActivTek, has the right and ability to control the actions of both companies and, particularly, their infringement of RGF's copyrighted Home Study Course.

38.     Jackson knew and directed that EcoQuest and ActivTek infringe upon RGF's copyrighted Home Study Course by marketing, selling, and distributing the Home Study Course to its distributors without paying RGF royalties therefore.

39.     Jackson derived a direct financial benefit from the infringement.

WHEREFORE, Plaintiff RGF Environmental Group, Inc., prays this Court to grant the following relief against Defendant Michael Jackson:

(a)     That Defendant Michael Jackson and all other persons acting in concert with or affiliated with him, be permanently enjoined and restrained from copying, reproducing, manufacturing, duplicating, disseminating, distributing, or otherwise using any unauthorized copies of the Home Study Course that is the subject of this Complaint, and from otherwise infringing RGF's copyrights in said product;

(b)     That Defendant Michael Jackson be ordered to file, within thirty (30) days of the issuance of the injunction, a sworn report setting forth in detail the manner in which he complied with the injunction;

(c)     That Defendant Michael Jackson be ordered to conduct an accounting of all financial benefits he personally derived from the making, using, marketing or selling unlicensed copies of the Home Study Course that is the subject of this Complaint;

(d)     That RGF be awarded its actual damages for the willful infringement of the Home Study Course by Defendants, EcoQuest and ActivTek, to which Defendant Jackson directed; and

7

(e)     That RGF be awarded such other and further relief as this Court deems just and proper.

## COUNT III:  BREACH OF CONTRACT
### (Against Defendant EcoQuest)

40.     RGF incorporates herein by reference the allegations in Paragraphs 1 through 26 above, as if fully set forth herein.

41.     RGF and EcoQuest entered into a contract wherein RGF designed and developed a Home Study Course and a Commercial Training Course that EcoQuest would market and sell.

42.     Pursuant to that contract, RGF and EcoQuest agreed to split the net profits derived from the sale of the Commercial Training Course.

43.     In addition, pursuant to their contract, RGF and EcoQuest agreed that EcoQuest would pay to RGF a fifteen dollar ($15.00) royalty and fifteen dollar ($15.00) commission to RGF's employee, Rick Hill, for the sale of each Home Study Course.

44.     EcoQuest has breached its contract with RGF by failing to pay RGF the net-profits from the sale of the Commercial Training Course offered by EcoQuest since June 2005.

45.     EcoQuest paid RGF half the net profits from the sale of three Commercial Training Courses in 2005.

46.     EcoQuest paid RGF the royalties due when EcoQuest distributed and sold its first 1,079 Home Study Courses in 2005.

47.     EcoQuest, however, has failed to pay RGF the royalties and commissions for each Home Study Course distributed and sold by EcoQuest since that time.  Attached hereto as **Exhibit "D"** is an email from EcoQuest sent to RGF on July 6, 2005, enclosing RGF's royalties and commissions for the Home Study Course and the Commercial Training Course owed at that time.

8

48.     EcoQuest has further breached its contract with RGF by attempting to circumvent the contract by distributing and selling both the Home Study Course and the Commercial Training Courses through its wholly owned-subsidiary ActivTek.

49.     As a result of EcoQuest's breaches, RGF has been damaged.

WHEREFORE, Plaintiff RGF Environmental, Inc., demands judgment against Defendant EcoQuest International, Inc., for damages, and for such other and further relief as this Court deems just and proper.

## COUNT IV:  BREACH OF CONTRACT
### (Against EcoQuest)

50.     RGF incorporates herein by reference the allegations in Paragraphs 1 through 26 above, as if fully set forth herein.

51.     In 2005, RGF sent a proposal to Jackson to present some new products, including, but not limited to, a Power Guard device for saving electricity that RGF would provide to EcoQuest for a consideration of a two percent (2%) royalty.

52.     The Power Guard was fully revealed to EcoQuest by RGF, and EcoQuest agreed to pay RGF a royalty if it chose to sell that product.

53.     Jackson on behalf of EcoQuest and RGF communicated back and forth, primarily through electronic mail, regarding this new product and several other new products, and Jackson acknowledged the two percent (2%) royalty, and that EcoQuest distributors would sell a lot of the products.

54.     In spite of those assurances, EcoQuest did not communicate any sales with RGF or advise RGF that EcoQuest was selling the Power Guard.

55.     In or about May 2008, RGF received a notice announcing the introduction of Power Guard by EcoQuest.

9

56. EcoQuest has breached its agreement with RGF by failing to pay RGF the royalties for EcoQuest's sales of the Power Guard.

57. As a result thereof, RGF has been damaged.

WHEREFORE, Plaintiff RGF Environmental, Inc., demands judgment against Defendant EcoQuest International, Inc., for damages, and for such other and further relief as this Court deems just and proper.

## COUNT V: ACCOUNTING

58. RGF incorporates herein by reference the allegations in Paragraphs 1 through 26 and Paragraphs 51 through 57 above, as if fully set forth herein.

59. RGF and EcoQuest entered into a contract wherein RGF designed and developed a Home Study Course and a Commercial Training Course that EcoQuest would market and sell.

60. Pursuant to that contract, RGF and EcoQuest agreed to split the net profits derived from the sale of the Commercial Training Course.

61. In addition, pursuant to their contract, RGF and EcoQuest agreed that EcoQuest would pay to RGF a fifteen dollar ($15.00) royalty and fifteen dollar ($15.00) commission to RGF's employee, Rick Hill, for the sale of each Home Study Course.

62. EcoQuest and ActivTek have offered and conducted the Commercial Training Course to its distributors since June 2005 without paying RGF its share of the net-profits.

63. In addition, since June 2005, EcoQuest and ActivTek have distributed and sold RGF's Home Study Course without paying RGF the per course royalty and commission.

64. RGF is unaware of how many Commercial Training Courses were offered by EcoQuest and ActivTek since June 2005, or the net profits that were derived therefrom.

65. RGF is unaware of how many Home Study Courses were sold and distributed by EcoQuest and ActivTek since the initial 1,079 EcoQuest paid RGF for.

66.     In addition, EcoQuest agreed to pay RGF a two percent (2%) royalty on all Power Guards it sold.  To date, however, RGF has not received any payments therefore.

67.     RGF is unaware of how many Power Guards EcoQuest has sold.

68.     RGF is without an adequate remedy at law because without an accounting, RGF cannot ascertain the total value of the net profits, royalties and commissions owed to it.

WHEREFORE, Plaintiff RGF Environmental Group, Inc., respectfully prays that this Court enter an Order directing Defendants, EcoQuest International, Inc. and ActivTek, Inc., to:

(a)     provide a detailed accounting of all Commercial Training Courses offered, including the expenses associated therewith, for the calculation of the net profits derived therefrom;

(b)     provide a detailed accounting of all Home Study Courses sold and distributed by EcoQuest or ActivTek; and

(c)     for such other and further relief as this Court deems just and proper.

### COUNT VI:  VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

69.     RGF incorporates herein by reference the allegations in Paragraphs 1 through 26 above, as if fully set forth herein.

70.     RGF is a competitor of EcoQuest and ActivTek in the environmental air quality market.

71.     RGF designed and developed the Home Study Course, and entered into an agreement with EcoQuest to market and sell the course to its distributors.

72.     RGF also designed and developed the Commercial Training Course that it, along with EcoQuest, would conduct on a regular basis throughout the United States, including Florida.

11

73.    Both the Home Study Course and the Commercial Training Course advised potential users that RGF developed the course and led consumers to believe that the courses are being taught in association with RGF.

74.    EcoQuest has intentionally and willfully excluded RGF from the Commercial Training Courses, and has reproduced and made unknown changes to the Home Study Course without authorization.

75.    Despite EcoQuest's refusal to cooperate with RGF, it has continued to use RGF's Home Study Course material and Commercial Training Course material, both of which reference RGF as being involved, without RGF's permission or participation.

76.    EcoQuest has also represented to its customers and others that it purchased RGF.

77.    RGF has been contacted by dissatisfied and confused consumers concerning the Home Study Course and Commercial Training Course offered and sold without RGF's permission by EcoQuest or ActivTek.

78.    EcoQuest, through ActivTek, continues to use RGF's materials and host the Commercial Training Courses without RGF's participation and consent, yet readily using and relying upon RGF's reputation to sell these products.

79.    These actions by EcoQuest and ActivTek unfairly deceive the consuming public as to RGF's role and participation.

80.    RGF's reputation as a leader in the environmental air quality industry is being tarnished as a result, and, as a result, is without a legal remedy.

WHEREFORE, Plaintiff RGF Environmental, Inc., respectfully prays this Court for entry of a judgment:

(a)     Declaring EcoQuest's and ActivTek's actions a deceptive and unfair trade practice;

(b)     Enjoining any further sale of the Home Study Course and Commercial Training Course without RGF's express authorization;

(c)     Awarding RGF its attorney fees and costs pursuant to § 501.2105 of the *Florida Statutes*; and

(d)     Awarding such other and further relief as this Court deems just and proper.

DATED:      June 20, 2008.

SHUTTS & BOWEN LLP
*Counsel for Plaintiff RGF*
200 East Broward Boulevard
National City Center, Suite 2100
Fort Lauderdale, Florida 33301
Tel.: (954) 524-5505
Fax: (954) 524-5506
gbagliebter@shutts.com
tkearns@shutts.com

By: _Temple Kearns_
GARY M. BAGLIEBTER
Florida Bar No. 346977
TEMPLE FETT KEARNS
Florida Bar No. 0306680

13

## VERIFICATION

STATE OF FLORIDA            )
                           )ss
COUNTY OF PALM BEACH )

Before me, the undersigned officer, duly authorized to administer oaths and take acknowledgments, personally appeared _SHARON B. Rinehimer_ of RGF Environmental Group, Inc., who after being duly sworn, deposes and says that I am the _Secretary_ of said corporation, with full authority to make this Verification on behalf of the corporation, that I have read the foregoing Verified Complaint and have personal knowledge of all facts and matters contained therein, and that all facts and matters contained therein are true and correct.

RGF ENVIRONMENTAL GROUP, INC.

By: _Sharon B. Rinehimer_

Its: _Secretary_

SWORN TO AND SUBSCRIBED before me this _20th_ day of June, 2008, by _Sharon B. Rinehima_ who is the _Secretary_ of RGF Environmental Group, Inc. and who is [✓] personally known to me or [ ] produced _____ _____ as identification.

_Louise C. Melillo_
NOTARY PUBLIC

(NOTARY SEAL)

_Louise C. Melillo_
Printed Name

NOTARY PUBLIC
Commission No.: _____

LOUISE C. MELILLO
MY COMMISSION # DD 498420
EXPIRES: February 13, 2010
Bonded Thru Budget Notary Services

# EXHIBIT "A"

# ASSET PURCHASE AND SALE AGREEMENT

## BY

## AND BETWEEN

## RGF ENVIRONMENTAL GROUP, INC.

## AND

## ECOQUEST INTERNATIONAL, INC.

1

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT ("Agreement"), dated as of June 01, 2004, by and between RGF Environmental Group, Inc., a Florida corporation ("Seller") and EcoQuest International, Inc., a Tennessee corporation ("Buyer").

### WITNESSETH

WHEREAS, Seller is engaged in, among other things, the development, design, engineering, testing, patenting and manufacturing of air, water, food and laundry, purification products and technologies;

WHEREAS, Seller proposes to sell to Buyer and Buyer wishes to purchase from Seller, certain of Seller's intellectual property assets all on the terms and conditions hereinafter set forth; and

WHEREAS, Seller and Buyer are entering into this Agreement to evidence their respective duties, obligations and responsibilities with respect to said purchase and sale of such assets.

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE 1
### DEFINITIONS, SCHEDULES AND EXHIBITS

1.1    Definitions.  The capitalized terms used in this Agreement (or in the Schedules and Exhibits to this Agreement) shall have the meanings set forth in Schedule 1.1

1.2    Schedules and Exhibits.  This Agreement includes the Schedules and Exhibits listed in the Index attached hereto.

### ARTICLE 2
### SALE AND PURCHASE OF ACQUIRED ASSETS

2.1    Sale and Transfer of Assets.  Subject to the terms and provisions of this Agreement, Seller hereby agrees to sell, convey, assign, transfer and deliver to Buyer and Buyer agrees to acquire and purchase from Seller, effective on Closing, all right, title, interest and goodwill of Seller in and to the following assets (the "Acquired Assets"):

      (a)    Intellectual Property.  With respect to ozone, ultraviolet (UV) light combined with a rare metal catalyst resulting in a technology trademarked as *Radiant Catalytic Ionization (herein after referred to as ("RCI"):*
        (i)    All trade names, trademarks, service marks, logos or other identifying words, designs or indicia and copyrights and any application or registration for any of

2

the foregoing, and all rights to sue for past infringement thereof, including all rights of Seller to those trademarks set forth in <u>Schedule 2.1(a)</u> (the "Trademarks");

(ii)    All patents, inventions, whether patentable or not, discoveries, improvements, ideas, know-how, formulae, methodology, processes, technology, computer programs, operating instructions, software, (including source code and object code) and databases, development documentation, programming tools, drawings, specifications and data, and all applications or registrations in any jurisdiction or country pertaining to the foregoing, including all invention records/disclosures, provisionals, reissues, reexaminations, continuations, divisions, continuations-in-part, renewals or extensions thereof, or inventors certificates, abandoned and unfiled patent applications, regardless of inventorship, the right to bring suit for past infringement of the patents, and the right to file for intellectual property protection anywhere in the world and to claim priority under International Treaties and Conventions for counterpart applications including those set forth in <u>Schedule 2.1(a)</u>;

(iii)    All trade secrets, know-how, including confidential and other non-public information, and the right in any jurisdiction to limit the use or disclosure thereof (the "Trade Secrets"); and

(iv)    Copies of all information inscribed or displayed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, including any and all proprietary artistic works (collectively, the "Intellectual Property Assets"). To the extent any Intellectual Property Assets set forth in <u>Schedule 2.1(a)</u> are owned by Seller but official recordation of such ownership has not been perfected in the U.S. or other countries, such Intellectual Property Assets shall be considered owned by Seller for purposes of this Agreement for transfer to Buyer.

(b)  <u>License Grant to Seller.</u>  In consideration of the obligations of Seller under this Agreement; Buyer hereby grants back and agrees to grant to Seller, and Seller accepts, subject to the provisions of this Agreement, an exclusive, non-revocable, transferable, royalty free, worldwide license to manufacture, use, sell, offer to sale, distribute and install Products *containing RGF's Patent-Pending "Photohydroionization" PHI-Cell technology* with a similar or same exterior housing as the as set forth in Schedule 2.1(a) <u>Products/Inventions *containing* RCI Proprietary Technology</u> : APS Commercial -Air Purification System, APS Mini-Air Purification System, PIP (Plug in Plus), only for industrial and commercial applications with the intent to distribute via Seller's "Industrial and Commercial Distributors and Reps" as set and further defined under DEFINITIONS herein.

In further consideration of the obligations of Seller under this Agreement; Buyer hereby grants back and agrees to grant to Seller, and Seller accepts, subject to the provisions of this Agreement, an exclusive, non-revocable, transferable, royalty free, worldwide license to manufacture, use, sell, offer to sale, distribute and install Products as the as set forth in Schedule 2.1(a) <u>Products/Inventions *not containing* RCI Proprietary Technology</u> : Commercial -Ozone System – a/k/a Turbozone® 1000, Mobile Pro - UV Light Based Ozone Generator, Electro Static Catalytic HVAC Filter – Central Heating/Air

3

Conditioning to their "Industrial and Commercial Product Line" as set and further defined under DEFINITIONS herein.

(i)     Seller shall have the right to freely transfer or sublicense the Products/Inventions as listed herein above under subsection (b) pursuant to the same terms and conditions as the License Grant to Seller provides and pursuant to the terms and conditions otherwise set forth herein this Agreement and provided that the sublicensee is not a Network (Multi-Level) Marketing, or Consumer Based Web Marketer or Consumer Catalog Company in the U.S. , Canada, Taiwan, Australia or U. K.

(c)     RGF Prototypes.  The RGF Prototypes listed in Schedule 2.1(b), including any and all related improvements, product developments, all machinery, equipment, accessories, computer hardware and materials annexed, affixed or attached thereto, together with any express or implied warranties of any item or component thereof and all Records relating thereto, all as listed on Schedule 2.1(b).

(d)     Bill of Materials.  With respect to the products/inventions set forth under Section 2.1(a) hereinabove and Schedule 2.1(a), the parties herein acknowledge that Bill of Materials for each was provided to Buyer.

(e)     Records.  To the extent Seller is legally permitted, copies of all Records owned, possessed or controlled by Seller inscribed or displayed on a tangible medium or that are stored in an electronic or other medium and retrievable in perceivable form pertaining to (i) the ownership and operation of any of the Acquired Assets; and (ii) the Trade Secrets;

(f)     Governmental Actions.  Governmental Actions/Filings and all pending applications therefore or renewals thereof, in each case to the extent transferable;

(g)     Goodwill.  All goodwill associated with the Acquired Assets;

(h)     Third Party Claims.  All claims, rights and defenses of Seller against third parties relating to any of the Acquired Assets, whether choate or inchoate, known or unknown, contingent or non-contingent, including all attorney work-product protections, attorney-client privileges and other legal protections and privileges to which Seller may be entitled.

(i)     Other Assets.  All other assets, properties and rights of Seller of every kind and nature, tangible and intangible, known or unknown, absolute or contingent, wherever located whether or not specifically referred to in this Agreement, which are related to or used or held for use in connection with or the operation of any of the Acquired Assets, including customer lists, customer proposals, marketing and sales brochures, advertising copy, and marketing plans and strategies.

2.2     Excluded Assets.  Seller shall not sell, and Buyer shall not acquire Seller's patent pending technology known as "Photohydroionization  " or ("PHI"), or Commercial and Industrial Product lines containing that technology or the "Excluded Assets" described herein under Definitions.

(a) Seller shall have the right to continue selling the "Photohydroionization" PHI

4

*Technology* to the following Reps and Distributors as described herein under Section 2.1 (b)(ix): RGF's Industrial and Commercial Distributors, Certified Commercial Distributors, International, OEM's, International, Commercial Private Label Customers provided they are not Multi Level or Consumer Based Web Marketers with the Intent that the Buyer's Distributor/Dealer Base will not have direct competition with Seller's Products that are the same as the acquired Assets listed herein under Section 2.1(a).

(b)   On or before the closing date herein, Seller agrees to notify in writing all of it's Consumer Based Web Marketers and Distributors including Vision, Oxyfresh, HTN and any other Network (Multi-Level) Marketing that Seller will discontinue it's supply of residential air purification units ("RAPI's") within ninety (90) days from the closing date herein. Seller will further advise them of their option to continue to market and sell said RAPI's  but to be purchased from Buyer after the ninety (90) day term has expired  Any revenues received by Seller with respect to sales of these products will be retained by the Seller during said post closing ninety (90) day time period. The mutual intent herein is to provide a time frame for the Seller to liquidate their RAPI inventory and for the Buyer to set up their manufacturing plant to accommodate said products. The Parties herein agree to work together to coordinate said transition and keep open communications with each other and said customers.

2.3   Assumption of Liabilities.   Subject to Section 2.4, Buyer shall assume and become obligated only with respect to any obligations or liabilities which arise out of the Acquired Assets as conducted by Buyer after the Closing (collectively "Assumed Liabilities").

2.4   Retained Liabilities.   Other than the Assumed Liabilities, Buyer does not and shall not assume, nor be responsible for paying, performing or discharging any other liabilities or obligations of Seller (the "Retained Liabilities"), and without limiting the foregoing, it is expressly agreed that Buyer shall not assume any liabilities or obligations of Seller:

(a)   with respect to any Excluded Asset (irrespective of whether such liabilities or obligations arise before, on or after the Closing Date);

(b)   with respect to Seller's acts or omissions;

(c)   for any federal, state or local income taxes, state or local property taxes or sales taxes and reports, or other taxes of any kind or description, due or alleged to be due for any period up to and including the Closing, including without limitation, fees and expenses arising out of any audit or investigation with respect to such taxes;

(d)   with respect to legal, brokerage, finder's or accounting fees or similar charges which may arise by reason of or with respect to this Agreement or any of the transactions contemplated hereunder;

(e)   which pertain to or arise out of any agreement, obligation or commitment of Seller to any employees or former employees of Seller, agents of or contractors to Seller, including, without limitation, any employee benefit plans, stock option plans, pension payments, severance payments, long-term or short-term disability payments, medical payments, workman's compensation, due or payable salary, bonus or other compensation or benefits,

5

incurred by Seller or any such employees or former employees, including medical claims for goods and services received by employees and former employees of Seller;

(f)     with respect to insurance policies of Seller and the premiums therefore;

(g)     in respect of any action, suit, proceeding, claim or investigation (collectively, "Proceedings") pending, brought or asserted (whether or not the same (i) is brought or asserted against Seller or any other person, (ii) is brought or asserted before, on or after the Closing or (iii) arises out of or in connection with those matters set forth on <u>Schedule 4.17</u> hereto) with respect to any act or failure to act by Seller or arising out of Seller's manufacture, use, distribution, sale or operation of any of the Acquired Assets prior to the Closing, including, but not limited to, claims of liability (regardless of whether made in contract, including breach of contract claims under Contracts assumed hereunder, or in tort); claims of infringement or misappropriation of patent or other intellectual property rights; warranty claims; products liability claims; and claims for consequential, special or punitive damages;

(h)     for any violation of any (i) rule, regulation, ordinance or code of any Governmental Authority or any (ii) order, writ, judgment, injunction, ruling, or decree issued by any federal, state, county or municipal court, agency or other Governmental Authority;

(i)     in respect of any Proceedings brought or asserted, or any governmental proceeding or investigation instituted prior to, on or after the Closing including but not limited to any Proceedings relating to, arising out of, or in connection with any alleged violation or noncompliance by Seller of, or failure by Seller to perform, any obligations imposed upon Seller under any statute, rule, regulation or ordinance, including, without limitation, those pertaining to protection of the Environment, employees, occupational safety and health, wages and hours, Hazardous Substances, civil rights, customs, export control, Permits and zoning;

(j)     arising out of any grievance, arbitration, charge or other proceeding arising from or relating to employee complaints made or filed against Seller or to any actions by Seller in connection with the sale of the Acquired Assets;

(k)     arising out of the failure of Seller to qualify to do business in any jurisdiction in which the character and location of the properties of Seller or the nature of the business transacted by Seller prior to the Closing made such qualification necessary;

(l)     for any indebtedness for borrowed money or in respect of letters of credit, guarantees, and surety bonds incurred in connection with the Acquired Assets;

(m)     with respect to any warranties of Seller that exist with third party customers or otherwise.

Seller agrees to discharge or to pay when due any and all Excluded Liabilities.

2.5     <u>Purchase Price</u>. Buyer shall pay to Seller a total purchase price of Four Million Dollars and 00/100 (US$4,000,000.00), for the Acquired Assets (the "Purchase Price") to be paid as follows:

6

(a) Two Million Dollars and 00/100 (US$2,000,000.00) of The Purchase Price shall be paid at Closing in immediately available funds denominated in US dollars to be wire transferred to the account of Seller designated in writing by Seller.

(b) One Million Dollars and 00/100 (US$1,000,000.00) shall be paid in monthly increments of Eighty Three Thousand Three Hundred Thirty Three Dollars and 33/100 (US$83,333.33) for a period of Twelve (12) consecutive months commencing Sixty (60) days after the effective date of the closing herein (Closing Date). Each payment must be received by Seller no later than the last business day of each month. If in the event payment is made after that time period a late charge of 1.5% per month shall be paid by Buyer.

(c) One Million Dollars and 00/100 (US$1,000,000.00) of the Purchase Price shall be due Fifteen (15) Months from the effective date of the closing herein (Closing Date) available funds denominated in US dollars to be wire transferred to the account of Seller designated in writing by Seller, or in the event the Buyer has initiated an Initial Public Offering ("IPO") the Seller will have the option to purchase up to One Million Dollars and 00/100 worth of convertible class A stock from the Buyer based on the initial offering price. Seller shall notify Buyer in writing of the intent to purchase said stock and the amount desired and the balance if any shall be paid in cash to the Seller as instructed herein above.

2.6    Allocation. Buyer will make all reasonable efforts to provide within thirty (30) days of Closing the Purchase Price allocation required by Section 1060 of the Code.

2.7    Marketing Information.  Seller has provided Buyer with marketing, product and sales brochures, and any available advertising copy, marketing plans and strategies for Buyer to determine, at its option, whether to engage any such market strategies.

2.8    Guardian Air Units. In addition to the Purchase Price herein above under section 2.5, Buyer agrees to purchase Seller's entire existing inventory (approximately 10,000 units) of Guardian Air Units as described in the attached Schedule 1.2. Said price of the Guardian Air Units shall be Forty Five Dollars and no/100ths (US$45.00) for each unit. Buyer shall complete the purchase within One Hundred twenty (120) days of the Closing Date herein. Buyer will have the option of purchasing additional Guardian Air Units at a price of thirty-seven dollars and no/100ths (US$37.00) per unit with minimum order requirements of 5,000 units. It is understood that the styling of the Guardian Air Unit is presently being sold under a private label Licensing Agreement with a company to be sold in Japan only under the label "Stellar Breeze," which will continue. RGF shall discontinue all other sales of the Guardian Air Units, including but not limited to Vision. Vision is presently selling Guardian Air units on their web site for $349.00 which may continue pursuant to the terms and conditions and time frame as set forth herein under Section 2.2(b).

2.9    Certification Classes. Seller agrees to offer to Buyer's Distributors, Seller's Self Study RCI Technology Course (Approximate Cost $100.00 per person) also an Indoor Air

Quality (IAQ) / Mold and Security Certification Course to be held monthly (Approximate Cost $250.00 per person). Buyer will review the contents of such courses, and Buyer and Seller will discuss the possibility of Buyer promoting the sale of such courses after the Closing Date; provided that Seller acknowledges that Buyer's ability to promote such courses will depend on several factors, including without limitation Federal Trade Commission regulations and related issues, and therefore whether Buyer will promote or sell such courses to Buyer's distribution channels will be determined by Buyer after the Closing Date in Buyer's sole discretion.

2.10   Alliance, Consulting and Engineering Services Fee: In addition to the Purchase Price herein above under Section 2.5, Buyer agrees to pay to Seller Ten Thousand Dollars and 00/100 (US$10,000.00) per month for a period of six (6) months to commence on July 01, 2004 as an Alliance, Consulting and Engineering Services Fee, plus applicable reasonable expenses as approved by Buyer. Said Fee and expenses will include the following:

(a)   Use of RGF's Name, logo, articles, videos, literature, test data, trade show displays, and Power Point Presentations;

(b)   Use of RGF's Strategic Alliance;

(c)   Use of RGF's facilities, tours, meetings, entertainment, etc.

(d)   Use of RGF's 800 number;

(e)   Use of RGF technological, engineering, legal, manufacturing and scientific employees;

(f)   Use of RGF's lab and testing facilities for future products;

(g)   Use of RGF'technical personnel for product research and consulting;

(h)   Sales and Marketing Assistance;

(i)   Exclusive use of one (1) office at RGF Corporate facility including all office services.

(j)   RGF to assist in providing design improvements for Buyer's existing *Fresh Air* product including but not limited to the replacement of TiO2/UV with the Seller's RCI technology and to reduce the maintenance and improve reliability;

(k)   This will cover all the existing duties RGF performs concerning air, water, food and laundry products only. It does not include factory labor or materials for the construction of models, prototypes or limited production runs.

## ARTICLE 3
## CLOSING

3.1   Closing Date. The purchase and sale provided for in this Agreement (the "Closing") shall take place at 10:00 a.m. on June 30, 2004 at the offices of Seller at 3875 Fiscal Court, West Palm Beach, Florida, or at such other date, time or place as may be fixed by agreement of the Parties, and the Parties agree that the Closing may be effectuated in counterparts and by facsimile. The date on which the Closing occurs is referred to herein as the "Closing Date."

8

3.2    Action to be Taken by Seller at the Closing.  At the Closing, in addition to the taking of such other action as may be provided in this Agreement, Seller shall deliver to Buyer:

(a) Authorizations.  A copy, certified by a duly authorized officer of Seller, of corporate resolutions authorizing the execution and delivery of this Agreement and all of the agreements and instruments attached as exhibits hereto, and the consummation of the transactions contemplated hereby and thereby by Seller and by the officers referred to in Section 3.2(b) on behalf of Seller;

(b) Secretary's Certificate.  A certificate of a duly authorized officer of Seller which shall identify by name and title and bear the signature of the officers of Seller duly authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby;

(c) Opinion of Counsel.  The Seller shall have delivered to the Buyer an opinion of their counsel dated the Closing and in form and substance reasonably satisfactory to Buyer and its counsel with respect to such matters as the Buyer or its counsel may reasonably request;

(d) Other Ancillary Agreements.  Seller (other than Buyer) shall have duly executed and delivered to Buyer the following Ancillary Agreements to which Seller is a party and such other documents and instruments of sale, transfer, conveyance and assignment as Buyer and its counsel may reasonably request in connection with the sale of the Acquired Assets and the removal of any lien(s) on the Acquired Assets each dated the Closing:

(i) the Bill of Sale and the Assignment and Assumption Agreement for the Acquired Assets and the assumption by Buyer of the Assumed Liabilities, duly executed by Seller, and if necessary or desirable, in recordable form;

(ii) the originally signed Intellectual Property and Trade Secret Assignments;

(iii) the Non-Compete Agreement

(collectively, the "Ancillary Agreements").

3.3    Action to be Taken by Buyer at the Closing.  At the Closing, in addition to the taking of such other action as may be provided in this Agreement, Buyer shall deliver to Seller:

(a) Purchase Price.  The payment of the Purchase Price described in Section 2.5 hereof;

(b) Authorizations.  A copy, certified by a duly authorized officer of Buyer, of corporate resolutions authorizing the execution and delivery of this Agreement and all of the agreements and instruments attached as exhibits hereto, and the consummation of the transactions contemplated hereby and thereby by Buyer and by the officers referred to in Section 3.3(c) on behalf of Buyer;

9

(c) <u>Secretary's Certificate</u>.  A certificate of a duly authorized officer of Buyer which shall identify by name and title and bear the signature of the officers of Buyer duly authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby;

(d) <u>Opinion of Counsel</u>.  The Buyer shall have delivered to Seller an opinion of their counsel dated the Closing and in form and substance reasonably satisfactory to Seller and its counsel with respect to such other matters as the Seller or its counsel may reasonably request;

(e) <u>Ancillary Agreements.</u>  Buyer shall have duly executed and delivered to Seller such Ancillary Agreements as required hereunder and all such other instruments of assumption as Seller and its counsel may reasonably request as necessary for Buyer to assume the Assumed Liabilities in accordance with this Agreement; except however that while Buyer will prepare at its own cost and file the necessary papers to substitute counsel selected by Buyer on the Intellectual Property Assets listed on Schedule 2.1(a), it will not be necessary for Buyer to have such papers duly executed and delivered at Closing.

3.4    <u>Covenant of Further Assurance</u>.  Without further consideration, each of Buyer and Seller shall at any time, and from time to time after the Closing Date, execute and deliver such further instruments of conveyance and transfer and do all such further acts and things as may be reasonably requested by the other party to effect, consummate, confirm or evidence the transfer of the Acquired Assets to Buyer, and Seller shall assist Buyer in the collection or reduction to possession of any and all of the Acquired Assets. Seller will execute assignment documents and other instruments in proper form and do all things requested by Buyer at anytime to assist in prosecution, procurement, enforcement or otherwise effecting the full enjoyment by Buyer of all rights assigned to Buyer under this Agreement, including rights to Intellectual Property Assets that either Party discovers should have been included in <u>Schedule 2.1(a)</u>. Seller will at Closing or within a period of time thereafter as determined solely by Buyer, execute assignment documents and other instruments as necessary and required by Buyer in a format as shown for example at Exhibit D, or in such other format as determined by Buyer, to transfer the Intellectual Property Assets at <u>Schedule 2.1(a)</u> to Buyer.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1    <u>Organization and Good Standing</u>.  Seller is a corporation duly organized and validly existing in good standing under the laws of the State of Florida, United States.  Seller is duly qualified to conduct business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where the failure to be so qualified or in good standing would not have a material adverse effect.

4.2    <u>Authorization</u>. Seller has full corporate power and authority to: (a) own and operate the Acquired Assets and to carry on its business in the manner and in the places as now conducted;

10

(b) convey the Acquired Assets to Buyer pursuant to this Agreement; and (c) enter into, perform and carry out its obligations under this Agreement and the Ancillary Agreements.

4.3     Execution, Delivery and Enforceability.  The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which Seller is a party and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action required on the part of Seller and this Agreement and the Ancillary Agreements to which Seller is a party in each case constitute the valid and legally binding obligations of Seller, enforceable against Seller in accordance with their terms.

4.4     No Violations or Defaults.  Neither the execution and delivery of this Agreement nor any of the Ancillary Agreements, nor the compliance by Seller with any provision hereof or thereof, nor the consummation of the transactions contemplated hereby or thereby will (with or without the giving of notice or passage of time or both): (a) violate, or conflict with, or result in a breach of any provisions of the organizational documents of Seller, (b) violate any law, regulation, order, writ, injunction, award, judgment or decree applicable to Seller or any of its assets, (c) conflict with, result in a breach of, constitute a default under, or give rise to the right to terminate, accelerate, modify or cancel, or require any notice under any agreement, contract, lease, license or other arrangement to which Seller or any of its properties are bound, or (d) result in the imposition of any Encumbrance upon any of the Acquired Assets.

4.5     Material Contracts.    (a) Schedule 4.5(a) hereto sets forth a true and correct list in all material respects of all Contracts relating principally to and material for the Acquired Assets including, but not limited to (i) each Contract with respect to which Seller has any liability or obligation of more than $10,000, contingent or otherwise, or which may extend for a term of more than one year after the Closing (ii) Contracts which place any limitation on the Seller's method of conducting or scope of conducting any business or related activity and (iii) each warranty, guaranty or other undertaking with respect to contractual obligations or performance extended by Seller other than in the normal course ("Material Contracts").  Complete copies of all Material Contracts have been provided to Buyer.

(b)     There is no Contract which constitutes an Acquired Asset or an Assumed Liability which is (i) a Contract with any director, officer or Affiliate of Seller; (ii) a Contract for the sale of any of the Acquired Assets (other than sales of inventory in the ordinary course) or the grant of any preferential rights to purchase any of the Acquired Assets or requiring the consent of any person to the transfer of any of the Acquired Assets; or (iii) a Contract evidencing any lien on the Acquired Assets (other than liens created in the ordinary course of business).

(c)     Each Material Contract, as of the date hereof (i) constitutes a valid and binding obligation of Seller, and (ii) is in full force and effect.  Seller is not in default, nor has an event occurred or do circumstances exist which would give rise to an event of default, by Seller, under any Material Contract, except such default as to which requisite waivers have been obtained. Seller is not aware of any events or circumstances that would give rise to a default by any other party under the Material Contracts.

4.6    Title.   (a)    Seller owns good and transferable title to all the Acquired Assets free and clear of any charges, claims, mortgages, servitudes, easements, leases, liens, pledges, security interests or other encumbrances (collectively, "Encumbrances") and the sale, transfer and delivery of such Acquired Assets will vest good and marketable title thereto free and clear of all Encumbrances.

(b)    Schedule 4.6(b) sets forth a list of all real property assets leased by Seller. All such leases are valid, binding and enforceable in accordance with their terms and Seller is a tenant or possessor in good standing thereunder and all rents due under such leases have been paid. Seller has not received any notice of appropriation, condemnation or like proceeding, or of any violation of any applicable zoning law or order relating to or affecting same.

4.7    Sufficiency of Intellectual Property Assets.   (a) Schedule 2.1(a) contains a complete and accurate: (i) list of all the names, trade names, trademarks, patents, registered copyrights, and all pending and abandoned applications thereto throughout the world, and (ii) list of invention disclosures/records, trade secrets, unpublished copyrights and other intellectual property that is material to the Business that the Seller owns, and which the Seller has used or is currently using, or intends to use or may use in the Business.

(b)    Schedule 2.1(a) contains a complete and accurate list of any and all licenses or other Contracts pursuant to which Seller grants a license to any Person to use the Intellectual Property Assets or where Seller is a licensee of any of the Intellectual Property Assets;

(c)    Seller is the sole and exclusive owner of all right, title and interest in and to all the trade names, trademarks, patents, registered and unpublished copyrights, and all pending applications thereto, and further including invention disclosures/records, trade secrets and other intellectual property listed on Schedule 2.1(a), and  each of the foregoing will be transferred to Buyer without prior Encumbrance or pre-existing license rights of any Person. To the extent that ownership of any of the Intellectual Property Assets listed at Schedule 2.1(a) is currently not recorded to be exclusively with Seller, Seller acknowledges that such Intellectual Property Assets are owned by Seller and that Seller has the absolute right to transfer same to Buyer as the owner thereof and will effect transfer of same as requested by Buyer.

(d)    Seller has the legal right to use each of the foregoing and all other intellectual property which has been used or is currently being used, or intends to use or may be used prior to the Closing Date in the Business free and clear of any Encumbrance or restrictions.

(e)    As of the Closing Date, the Seller has not received any notice that any aforementioned products or services breach, infringe or violate the intellectual property rights of any third party.

(f)    Other than the pre-existing Certified Commercial Distributor Program in the U.S. and Canada and supply sales to the Government and Military, Industrial and Commercial International, OEM Accounts, Distributors, Reps, and  Industrial and/or Commercial Private Label Agreements and our existing agreement in Japan for Guardian Air; Seller will not become a party to any assignment, grants, licenses, obligations, business arrangements or agreements,

12

written or oral, inconsistent with this Agreement, and that Seller has no actual knowledge of, or any information to form a reasonable belief for invalidity or unenforceability of such Intellectual Property Assets at Schedule 2.1(a).

4.8     Condition and Sufficiency of Acquired Assets.  All of the Acquired Assets are in good operating condition and repair, usable in the ordinary course consistent with past practice, ordinary wear and tear excepted.  The Acquired Assets constitute all such assets necessary and sufficient for Buyer to operate its air and water purification business as contemplated herein.

4.9     Books and Records.  To the extent related to the Acquired Assets, the books of account, and other records of Seller, are accurate and complete in all material respects and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls as reasonably determined by Seller.  Each transaction of Seller related to the Acquired Assets is properly and accurately recorded on the books and records of Seller, and each document (including any Contract, invoice or receipt) on which entries in Seller's books and records are based is accurate and complete in all material respects.

4.10    Assumptions or Guarantees of Indebtedness.  Seller does not have any direct or contingent liability arising from any indebtedness of any customer, supplier or employee (including, without limitation, liability by Contract, contingent or otherwise, to provide funds for payment, to supply funds or to otherwise invest in or otherwise to assure any Person against any liability) whether as a result of the assumption, guarantee or endorsement of any debt or otherwise.

4.11    Taxes.  (a) Seller has filed all returns, reports and declarations that are required to be filed by it with respect to any Tax and Seller has paid all Taxes that have become due as indicated thereon, except as disclosed in Schedule 4.11 where Seller is contesting the same in good faith by appropriate Proceedings, where the failure so to file or pay could have a material adverse effect on the Acquired Assets.  As of the date of filing, all such Tax returns and reports are correct and complete in all material respects.

        (b)     There is no Tax lien, whether imposed by any federal, state, county, local or other taxing authority, outstanding against the Acquired Assets that will not be removed or discharged prior to the Closing Date.

        (c)     Seller has not granted any extension or waiver of the statute of limitations period applicable to any return, which period (after giving effect to such extension or waiver) has not yet expired.

4.12    Customers and Suppliers.  Schedule 4.12 lists the names of Seller's current suppliers in the Field for the Acquired Assets. There exists no actual or any threatened, termination, cancellation or material limitation of, or any material change in, the business relationship of Seller with any customer, supplier, group of customers or group of suppliers listed in Schedule 4.12. No customer of Seller has any right to any credit or refund for products sold or services rendered or to be rendered by Seller pursuant to any Contract, understanding or practice of Seller.

13

4.13    Insurance. Schedule 4.13 sets forth a true and correct list of all claims made with respect to the Acquired Assets under any insurance policies maintained by or for the benefit of the Seller. Except as otherwise disclosed in Schedule 4.13, Seller has not been denied any insurance coverage with respect to the foregoing or been unable to obtain such coverage at commercially reasonable rates. Seller has complied with each such insurance policy and program and has not failed to give any notice or present any claim there under in a due and timely manner which failure would reasonably be expected to result in a loss or forfeiture of any material right thereunder.

4.14    Environmental Matters. There are no Environmental Conditions existing at the Leased Premises; (ii) there are no violations of any Environmental Laws with respect to the operation or use of the Acquired Assets, the Leased Premises, or Corona Discharge Ozone Systems (iii) Seller has not received any communication from any Governmental Authority stating that the operation or condition of any of the Acquired Assets or the Leased Premises, Corona Discharge Ozone Systems or any other real property used by Seller with respect to the same is in violation of any Environmental Law or any Permit issued pursuant to any Environmental Law;

(b) Seller has obtained and currently maintains all Permits required to be maintained thereby under all Environmental Laws necessary to use the Acquired Assets and there is no pending, or threatened proceeding, action, or claim to revoke or materially modify the terms or conditions of such Permits;

(c) Seller is not the subject of or subject to any outstanding written order, judgment, ruling, agreement or contract with any Governmental Authority or other Person with respect to (i) Environmental Laws, (ii) Remediation or (iii) any Release or threatened Release of a Hazardous Substance;

(d)    Seller has no knowledge of any facts, circumstances or conditions that could reasonably be expected to result in Seller incurring any material liabilities under or pursuant to any Environmental Law;

(e)    there are no proceedings or investigations pending or threatened against Seller which could reasonably be expected to lead to the imposition of any liability on Seller pursuant to any Environmental Law; and

(f)    there is not located at any of the properties listed any (i) underground storage tanks, (ii) asbestos-containing material or (iii) equipment containing polychlorinated biphenyls.

4.15    No Consents. Except as set forth on Schedule 4.15, no Regulatory Approval is required to be obtained or made by Seller in connection with Seller's execution, delivery and performance of this Agreement and the Ancillary Agreements by Seller, or the consummation of the transactions contemplated hereby or thereby.

4.16    Compliance with Laws; Permits.    (a) No event has occurred or circumstance exists that constitutes or results in (with or without the giving of notice or passage of time) a violation

14

of or failure to comply with any term or requirement of any Governmental Actions/Filings with respect to any of the Acquired Assets. Seller has not received any notice or other communication (whether oral or written) from any Governmental Authority or other such party regarding any actual, alleged or potential violation of, or failure to comply with, any term or requirement of any Governmental Actions/Filings in connection with any of the Acquired Assets. Seller has been granted and holds, and has made, all Governmental Actions/Filings (including, without limitation, the Governmental Actions/Filings required for the manufacture and sale of all products manufactured and sold by it) necessary to the conduct by Seller of the Business. Each such Governmental Action/Filing is in full force and effect and will not expire prior to Closing and Seller is in compliance with all its obligations with respect thereto. Schedule 4.16(a) lists each Governmental Action/Filing to which Seller, in connection with the Business, or any of the Acquired Assets, is or has been subject. None of Seller's officers, directors, agents or employees are subject to any Governmental Actions/Filings that prohibits such officer, director, agent or employee from engaging in or continuing any conduct, activity or practice relating to the Business.

(b)     Schedule 4.16(b) sets forth a complete and correct list of any and all applicable Permits issued and held by Seller that relate to or which are necessary for the ownership and operation of the Acquired Assets. Such Permits have been validly acquired, are in full force and effect and will not be terminated or impaired (or become terminated or impaired) as a result of the transactions contemplated hereby. Seller's use and operations of the Acquired Assets currently are and have been at all times in compliance with such Permits and Seller has received no notice from any Governmental Authority that Seller's use and operation of the Acquired Assets or condition thereto violates or potentially violates such Permits.

4.17    Litigation. To the Seller's knowledge and belief, there is no pending or threatened action, litigation (including arbitration) or Proceeding, by any Governmental Authority or private person which has resulted, or is likely to result in (a) the institution of legal proceedings to prohibit, enjoin or restrain the performance by Seller of this Agreement or any of the Ancillary Agreements to which Seller is to be a party, or (b) a claim for damages related to the Acquired Assets, the Business or any of the Ancillary Agreements or that may adversely affect the operations of the Business or the Acquired Assets.

4.18    No Brokers. Seller has not entered into and will not enter into any agreement, arrangement or understanding with any Person which will result in the obligation of Buyer to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated hereby.

4.19    Disclosure. No representation or warranty of Seller in this Agreement and no statement in any Schedules attached hereto contains any material untrue statement or omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

4.20.    Seller's Conduct Prior to Closing. Seller covenants and agrees that during the period from the date hereof to the Closing Date Seller has: (a) operated the Acquired Assets in the ordinary course of business consistent in all material respects with past practice;

15

b)      maintained the Acquired Assets, including any equipment related thereto, in good repair and operating condition;

c)      maintained in full force and effect all Permits and insurance policies relating to the Acquired Assets;

d)      not entered into or amended any contract as to any Acquired Assets, except those made in the ordinary course of business, the terms of which are consistent in all material respects with past practice;

e)      not terminated, caused the termination of, amended, renewed or extended any Contract except in the ordinary course of business and consistent with past practice;

f)      not waived or released any of its rights with respect to any of the Acquired Assets or permitted any of such rights to lapse or go abandoned;

g)      not sold, transferred or otherwise disposed of any of the Acquired Assets or any interest therein or agree to do any of the foregoing, except for Acquired Assets which are replaced with other assets having a similar value and utility, except however that the Acquired Assets included in Sections 2.1(a) and 2.1 (b) and those set forth on the corresponding Schedules will not be replaced but rather may have subject matter added thereto by further developments of such Acquired Assets;

h)      not incurred, made, assumed or suffered to exist any lien, tenancy or other matter affecting title to any of the Acquired Assets; and

i)      there has been no casualty, loss, damage or destruction with respect to any of the Acquired Assets to be transferred to Buyer under this Agreement.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1    Organization and Good Standing. Buyer is a corporation duly organized and validly existing in good standing under the laws of the State of Tennessee, United States. Buyer is duly qualified to conduct business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where the failure to be so qualified or in good standing would not have a material adverse effect.

5.2    Authorization. Buyer has full corporate power and authority to: (a) carry on its business in the manner and in the places as now conducted; (b) purchase and operate the Acquired Assets and to (c) enter into, perform and carry out its obligations under this Agreement and the Ancillary Agreements.

5.3     Execution, Delivery and Enforceability. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action required on the part of Buyer.  Assuming Seller's due authorization, execution and delivery of this Agreement and the Ancillary Agreements, and further assuming the Agreement and the Ancillary Agreements are enforceable against Seller, this Agreement and the Ancillary Agreements to which Buyer is a party in each case constitute the valid and legally binding obligations of Buyer, enforceable against Buyer in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general applicability relating to or affecting the enforcement of creditors' rights, and by general equitable principles.

5.4     No Violations or Defaults. Except as set forth on Schedule 5.4 hereto, neither the execution and delivery of this Agreement nor any of the Ancillary Agreements, nor the compliance by Buyer with any provision hereof or thereof, nor the consummation of the transactions contemplated hereby or thereby will (with or without the giving of notice or passage of time or both): (a) violate, or conflict with, or result in a breach of any provisions of the organizational documents of Buyer, (b) violate any law, regulation, order, writ, injunction, award, judgment or decree applicable to Buyer or any of its assets, or (c) conflict with, result in a breach of, constitute a default under, or give rise to the right to terminate, accelerate, modify or cancel, or require any notice under any agreement, contract, lease, license or other arrangement to which Buyer or any of its properties are bound.

5.5     Litigation. Except as set forth on Schedule 5.5, to Buyer's knowledge and belief, there is no pending or threatened action, litigation (including arbitration) or Proceeding, by any Governmental Authority or private person which has resulted, or is likely to result in (a) the institution of legal proceedings to prohibit, enjoin or restrain the performance by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is to be a party, or (b) a claim for damages as a result of this Agreement or any of the Ancillary Agreements, except for matters that will not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

5.6     No Consents. Except as set forth on Schedule 5.6, no Regulatory Approval is required to be obtained or made by Buyer in connection with Buyer's execution, delivery and performance of this Agreement and the Ancillary Agreements by Buyer, or the consummation of the transactions contemplated hereby or thereby.

5.7     No Brokers. Buyer has not entered into and will not enter into any agreement, arrangement or understanding with any Person which will result in the obligation of Seller to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated hereby.

## ARTICLE 6
## COVENANTS OF THE PARTIES

The Parties hereto hereby covenant and agree:

17

6.1     Cooperation to Consummate Transaction.  Subject to the terms and conditions of this Agreement, each of the Parties will use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby.

6.2     Confidentiality.  (a)  Buyer acknowledges, as a result of the transactions contemplated by this Agreement, its access to and the cooperation of employees of Seller and Seller's Affiliates prior to the date hereof and Buyer's access to Seller's business operations, other than the Business, prior to the date hereof, that Buyer may have acquired or have access to a substantial amount of confidential and proprietary technical information and technology belonging to Seller. Buyer acknowledges that such information and technology is and will remain proprietary to Seller and its Affiliates, and Buyer agrees to cause Buyer's present and future Affiliates as well as its and their respective officers, employees, agents, advisors, financing sources and other representatives to hold such information and technology in strict confidence and not to disclose or to make any use of such information and technology to the extent such information and technology is not to be transferred to Buyer under this Agreement.  The obligations set forth in this Section with respect to business and financial information shall terminate on the third anniversary of the Closing Date hereof, while the obligations with respect to technical information (including, without limitation, scientific records and data, trade secrets, technology and similar information) shall terminate on the twentieth (20th) anniversary from the Closing Date hereof.

(b)     Seller acknowledges that it may be in possession of or have access to a substantial amount of confidential and proprietary technical information and technology relating to Buyer's business operations or to the  Acquired Assets that will on and after the Closing Date hereof belong to Buyer.  Seller acknowledges that, effective as of the Closing Date hereof, such information and technology will be proprietary to Buyer and Seller agrees to cause its present and future Affiliates as well as its and their respective officers, employees, agents, advisors, financing sources and other representatives to hold such information and technology in strict confidence and not to disclose or to make any use of such information and technology except as otherwise contemplated or permitted under this Agreement and the Ancillary Agreements or as required by law.  The obligations set forth in this Section with respect to business and financial information shall terminate on the third anniversary from the Closing Date hereof, while the obligations with respect to technical information (including, without limitation, scientific records and data, trade secrets and technology and similar information) shall terminate on the twentieth (20th) anniversary from the Closing Date hereof.

(c)     The provisions set forth in subclauses 6.3(a) and 6.3(b) above relating to confidential or proprietary information shall not apply (or shall cease to apply) with respect to information and technology that (i) is or hereafter becomes generally available to the public other than through breach of this Section as shown by reasonable proof; (ii) becomes available to the recipient party on a non-confidential basis from a source other than the disclosing party or any Affiliate thereof or any representative thereof, provided that such source is not known by the recipient party (after due inquiry) to be bound by a confidentiality agreement with or other

18

obligation as to confidentiality, non-disclosure and/or non-use to the disclosing party or any other person; (iii) was or is developed by the recipient party independently and without reference to any confidential or proprietary information of the disclosing party as shown by reasonable proof; (iv) may be disclosed or used as specifically contemplated by this Agreement or the Ancillary Agreements; or (v) is required to be disclosed to the extent required by any Governmental Authority, provided that prior to making any disclosure pursuant to this subsection, the recipient party shall notify the disclosing party of the same and the disclosing party shall have the right to participate with the recipient party in determining the amount and type of information, if any, which must be disclosed in order to comply with such Governmental Authority's request.

(d)     The obligations of non-disclosure and non-use set forth in subclauses 6.2(a) and 6.2(b) above shall be in addition to and not in lieu of any restrictions on use and disclosure of information contained in any other agreements between the Parties or any Affiliates or representatives thereof.

6.3     Intellectual Property. (a) Seller will neither challenge nor interfere with Buyer's ownership of the Intellectual Property Assets listed in Schedule 2.1(a) or any related technologies that Buyer may develop, nor will Seller use any trademark, trade name, service mark, logo or other identifying word, design or indicia confusingly similar to Buyer's trademarks. Seller will notify Buyer of any other related Intellectual Property Assets that Seller becomes aware of and which have not been included in Schedule 2.1(a), such other Intellectual Property Assets to be made part of this Agreement under the existing consideration provided by the Parties hereto. Seller will complete all papers as required and prepared by Buyer to effect transfer of all right, title and interest in such other Intellectual Property Assets to Buyer. Should Seller become aware of such other related Intellectual Property Assets, Seller will also immediately send to Buyer copies of documents and materials pertaining to such other Intellectual Property Assets.

(b) Seller further agrees that it will not use with any third party any Trade Secrets or Intellectual Property Assets of Section 2.1(a) without the prior written authorization from Buyer.

6.4     Existing Marketing Efforts.  Seller agrees that it shall terminate all marketing and other directed sales efforts to third parties with respect to the Acquired Assets prior to Closing, except that which is otherwise specifically approved in writing by Buyer.

## ARTICLE 7
## CONDITIONS PRECEDENT TO CLOSING

7.1     Seller's Obligations.  Buyer's obligation to purchase the Acquired Assets and to assume the Assumed Liabilities and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)     Accuracy of Representations and Warranties.  All of Seller's representations and warranties in this Agreement (considered both collectively and individually) shall be true and

19

correct in all respects on and as of the Closing Date with the same force and effect as though made on and as of such date;

(b)      Performance and Compliance.  Seller shall have performed or complied with each covenant, obligation and agreement to be performed or complied with by it under this Agreement on or before the Closing Date;

(c)      Consents and Approvals.  The Seller shall have obtained or made each consent to assignment or transfer, authorization, approval, exemption, filing, registration or qualification, if any, listed on any Schedule hereto or which are otherwise necessary for the Seller to execute, deliver and perform this Agreement and the other Ancillary Agreements. Buyer may elect to receive evidence, satisfactory to Buyer, that all of the consents indicated on any Schedule hereto have been duly obtained without the necessity of changing the terms and conditions available to the Seller under the agreement or instrument underlying any such consent.

(d)      Litigation.  There shall be no pending or threatened Proceedings pending or threatened by or before any Governmental Authority (i) seeking to restrain, prohibit or invalidate any of the transactions contemplated hereby or by any of the other Ancillary Agreements or to obtain damages or other relief in connection with this Agreement or the transactions contemplated hereby, or (ii) in which any party seeks to obtain any remedy or form of relief under any statute, regulation or other law in connection with the transactions contemplated by this Agreement, and Seller shall not have received notice of any pending or threatened investigation that might reasonably be expected to eventuate in any such action, suit or proceeding;

(e)      Material Adverse Change.  No event shall have occurred and no condition shall exist which, individually or in the aggregate, constitutes or, with the giving of notice or the passage of time, or both, is reasonably likely to constitute, a material adverse change to the Acquired Assets;

(f)      Intellectual Property.  Seller shall have provided or will provide to Buyer at least ten (10) days prior to the Closing Date a complete copy of the files, official correspondence, Records, papers, photographs and any other documents and materials that pertain to the Intellectual Property Assets set forth at Schedule 2.1(a).

(h)      Other Instruments of Sale.  All such other instruments of sale, transfer, conveyance and assignment as Buyer and its counsel may reasonably request in connection with the sale of the Acquired Assets and the removal of any Encumbrances on the Acquired Assets.

7.2    Buyer's Obligations.  Seller's obligation to sell the Acquired Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

(a)      Accuracy of Representations and Warranties.  All of Buyer's representations and warranties in this Agreement (considered both collectively and individually) shall be true and

20

correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of such date;

(b)  Performance and Compliance.  Buyer shall have performed or complied with each covenant, obligation and agreement to be performed or complied with by it under this Agreement on or before the Closing Date;

(c)  Consents and Approvals.  Buyer shall have obtained or made each consent to assignment or transfer, authorization, approval, exemption, filing, registration or qualification, if any, listed on any Schedule hereto or which are otherwise necessary for Buyer to execute, deliver and perform this Agreement and the other Ancillary Agreements;

(d)  Litigation.  There shall be no pending or threatened Proceedings pending or threatened by or before any Governmental Authority (i) seeking to restrain, prohibit or invalidate any of the transactions contemplated hereby or by any of the other Ancillary Agreements or to obtain damages or other relief in connection with this Agreement or the transactions contemplated hereby, or (ii) in which any party seeks to obtain any remedy or form of relief under any statute, regulation or other law in connection with the transactions contemplated by this Agreement, and Buyer shall not have received notice of any pending or threatened investigation that might reasonably be expected to eventuate in any such action, suit or proceeding;

(e)  Other Instruments of Sale.  All such other instruments of assumption as Seller and its counsel may reasonably request as necessary for Buyer to assume the Assumed Liabilities in accordance with this Agreement.

## ARTICLE 8.
## TAXES; PRORATION OF CERTAIN COSTS

8.1  Sales and Transfer Taxes. In addition to the preparation and filing of all tax returns pertaining to periods up to the Closing, and for all other taxes related thereto, Seller will be responsible for the preparation and filing of all relevant sales and transfer tax returns as required hereunder and shall pay, in a timely manner, all Taxes resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement. Buyer shall provide such resale and exemption certificates as might be applicable as soon as reasonably possible after Closing.

8.2  Property Taxes. Seller and Buyer shall pro-rate all personal property (ad valorem) Taxes for the year in which the Closing occurs on the basis of time each Party owned the Acquired Assets during that year.

8.3  Abatements, Refunds and Credits. Seller shall be entitled to any abatements, refunds or credits of Taxes relating to the Acquired Assets for the period prior to and including the Closing Date. Buyer will promptly notify and forward to Seller the amounts of any such abatements, refunds or credits received by Buyer within fifteen (15) days after receipt thereof. Any abatements, refunds and credits of Taxes relating to a period both prior to and after the Closing

21

Date hereof shall be shared (net of the reasonable costs of obtaining such abatements, refunds and credits) proportionately between Seller and Buyer based on the portion of the taxable period in question that each owned the Acquired Assets.

8.4     Proration of Certain Expenses.  Except as set forth in Sections 8.1 through 8.3, all expenses relating to the business operations of the Acquired Assets that are normally pro-rated, for the period prior to and including the Closing Date will be for the account of Seller, and all such expenses for the period after the Closing Date will be for the account of Buyer, all as determined by the accrual method of accounting.  All prorations will be made within sixty (60) days following the Closing Date and agreed by the Parties. Seller shall further reimburse Buyer, by certified check or wire transfer on the Closing Date, for all prepaid amounts and any other monies owed by Seller to Buyer.

**ARTICLE 9**
**COOPERATION AND ACCESS TO INFORMATION**

9.1     Access to Information.  Upon reasonable advance notice from Buyer, Seller shall furnish to the Buyer and its employees, counsel, accountants and other agents and consultants full and free access, during regular business hours, to Seller's personnel, including Seller's employees, properties and all other information concerning the Acquired Assets as any of them may reasonably request.  Seller shall also provide Buyer access for review of manufacturing information and files for Intellectual Property Assets; except however that such access will not relieve Seller of providing to Buyer at least ten (10) days prior to Closing the original files or copies thereof for those Intellectual Property Assets listed at Schedule 2.1(a).

9.3     Notification of Transfer.  At all times following the date hereof, Buyer will notify promptly all relevant Governmental Authorities and third Persons of the change in ownership of the Acquired Assets resulting from the transactions contemplated herein, to the extent required by applicable law or the specific underlying agreements.

**ARTICLE 10**
**TERMINATION**

10.1   Termination.  This Agreement may be terminated at any time prior to Closing by notice from one Party to the other Party hereto under the following circumstances:

(a)     by Seller, if there has been a material breach by Buyer of any representation, warranty, covenant or late payment contained in this Agreement, and such breach is not cured by the earlier of the Closing Date or the date thirty (30) Business Days after receipt by Buyer of notice specifying particularly such breach, and such breach has not been waived by Seller;

(b)     by Buyer, if there has been a material breach by Seller of any representation, warranty or covenant contained in this Agreement and such breach is not cured by the earlier of the Closing Date or the date thirty (30) Business Days after receipt by Seller of notice specifying particularly such breach, and such breach has not been waived by Buyer;

22

(c)      by Buyer if any condition in Section 7.1 has not been satisfied as of the Closing Date and Buyer has not waived such condition on or before such date;

(d)      by Seller if any condition in Section 7.2 has not been satisfied as of the Closing Date and Seller has not waived such condition on or before such date; or

(e)      by mutual written agreement of Seller and Buyer.

10.2    Effect of Termination.  In the event that this Agreement is terminated by either Party prior to Closing pursuant to Section 10.1, all further obligations of the Parties hereunder will terminate, except for obligations or liabilities which survive such termination by their own terms, without further liability or obligation of either Party to the other Party hereunder; provided that, no Party will be released from liability hereunder if this Agreement is terminated and the transactions abandoned by reason of (a) failure of such Party to have performed its obligations hereunder or (b) any misrepresentation made by such Party of any matter set forth herein.

(a)    In the event either Party commits any material breach herein, then the other party may terminate this Agreement upon thirty (30) days' prior written notice to the defaulting party unless the defaulting Party cures such breach or default within such thirty (30) business day period to the other party's reasonable satisfaction.

(b)    In the event Buyer fails to cure said breach as set forth under Section 10.2 (a) herein, then all Intellectual Property rights described under Section 2.1 (a) shall revert back to the Seller. Buyer shall use its best efforts to reasonably assist in preparing any necessary documentation to expedite said reversion.

10.3    Termination of Alliance, Consulting and Engineering Services Fee.  In the event Buyer desires to cancel the Alliance, Consulting and Engineering Services Fee ("Alliance Fee") as set forth herein under Section 2.11 after the initial six (6) month time frame, it may do so provided thirty (30) day written notice is given to Seller of their intent to do so. Termination of the Alliance Fee by the Buyer will not terminate the entire Agreement, only the applicable Alliance fee sections herein.

## ARTICLE 11
## SURVIVAL OF REPRESENTATIONS, WARRANTIES
## AND AGREEMENTS; INDEMNIFICATION

11.1    Survival of Representations, Warranties and Agreements.  The representations, warranties and agreements of Seller and of Buyer, contained in this Agreement or in any exhibit, schedule, certificate, list or other instrument delivered pursuant hereto shall survive the Closing Date, subject to the limitations of this Article 11.  Each warranty and representation of a party contained herein is independent of all other warranties and representations contained herein (whether or not covering an identical or a related subject matter) and must be independently and separately complied with and satisfied.  Exceptions or qualifications to any warranties or representations contained herein shall not be construed as exceptions or qualifications to any other warranty or representation.  The right to indemnification, payment of damages or other remedy based on such representations, warranties, covenants and obligations shall not be

23

affected by any investigation conducted with respect to, or any knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of, or compliance or noncompliance with, any such representation, warranty, covenant or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, shall not affect the right to indemnification, payment of damages or other remedy based on such representation, warranty, covenant or obligation.

11.2    <u>Indemnification by Seller.</u>  Seller will indemnify, defend and hold harmless the Buyer Group from and against any and all Claims asserted against the Buyer relating to, resulting from or arising out of (a) any misrepresentation or breach by Seller of any representation or warranty contained in Article 4 or in any other provision of this Agreement as if such representation or warranty were made as of the Closing Date, (b) any breach or non-fulfillment of any covenant or agreement by Seller herein, (c) any Excluded Liabilities, (d) any failure to comply with any Bulk Transfer Laws.

11.3    <u>Indemnification by Buyer</u>.  Buyer will indemnify, defend and hold harmless each member of the Seller Group from and against any and all Claims asserted against or suffered by any such member (whether instituted by a third party against any such member of the Seller Group or by a member of the Seller Group for the purpose of enforcing its rights hereunder) relating to, resulting from or arising out of (a) any misrepresentation or breach of any representation or warranty by Buyer contained in Article 5  (b) any breach or non-fulfillment of any covenant or agreement by Buyer herein or (c) any Assumed Liabilities.

11.4    <u>Notice of Claim</u>.  Promptly after obtaining knowledge of a Claim for which it believes that it is entitled to indemnity under this Section 11, the Person seeking indemnification hereunder (the "<u>Indemnitee</u>") will promptly notify the Party against whom indemnification is sought (the "<u>Indemnitor</u>") in writing of such Claim (a "<u>Notice of Claim</u>").  A Notice of Claim will specify, in reasonable detail, (including a copy of the Claim to the extent available) the facts known to the Indemnitee regarding the Claim and shall indicate the estimated amount, if practicable, of the Claim that has been or may be asserted against the Indemnitee.  Subject to the terms of this Agreement, the failure to provide (or timely provide) a Notice of Claim will not affect the Indemnitee's rights to indemnification, except to the extent the Indemnitor is actually prejudiced thereby; <u>provided</u>, <u>however</u>, the Indemnitor is not obligated to indemnify the Indemnitee for the increased amount of any Claim which would otherwise have been payable to the extent that the increase resulted from the failure to timely deliver a Notice of Claim.

11.5    <u>Defense of Third Party Claims</u>.  (a) Except as otherwise provided in subclause 11.5(b) below, the Indemnitor will have the right to conduct and control, at its expense, the defense, compromise or settlement of any Third Party Claim or demand set forth in a Notice of Claim with counsel of its choice; <u>provided, however</u>, that the counsel to be retained shall be subject to the prior written approval of the Indemnitee, not to be unreasonably withheld or delayed.  If (i) the Indemnitor fails to notify the Indemnitee in writing within thirty (30) days that it intends to undertake a defense or contest a Third Party Claim with due diligence, or (ii) the Indemnitor fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps or (iii) the Indemnitee has been advised by its counsel that it may have

24

defenses available to it which are different from or in addition to those available to Indemnitor, or that its interests in such Claim are adverse to Indemnitor's interests, then the Indemnitee may undertake its own defense, compromise or settlement and the Indemnitor will be bound by the result obtained by the Indemnitee and will be liable for all reasonable expenses, including, without limitation, legal expenses associated with the defense of such Claim.

11.6    Cooperation. The Party defending the Third Party Claim will (a) consult with the other Party throughout the pendency of the Third Party Claim regarding the investigation, defense, settlement, compromise, trial, appeal or other resolution thereof, and (b) afford the other Party the opportunity, by notice, to participate and be associated with the defense of the Third Party Claim through counsel chosen by such other Party at its own expense, provided, however, if the named parties to any such proceedings (including any impleaded parties) include both the Indemnitee and Indemnitor and representation of the Indemnitee and Indemnitor by the same counsel would be inappropriate due to actual or potential differing interests between them, then the Indemnitee shall have the right to retain its own counsel at the cost and expense of the Indemnitor. The Parties will cooperate in the defense of the Third Party Claim. The Indemnitee will make available to the Indemnitor or its representatives all Records and other materials reasonably required for use in defending any Third Party Claim (subject to the confidentiality provisions hereof) and will furnish such testimony and attend such conferences, discovery proceedings, hearings, trials, and appeals as may be reasonably requested by the Indemnitor. If reasonably requested by the Indemnitor, the Indemnitee will cooperate with the Indemnitor and its counsel in defending any Third Party Claim that the Indemnitor elects to contest or, if appropriate, in making any counterclaim against the Person asserting the claim or demand, or any cross-complaint against any Person. The Indemnitor will reimburse the Indemnitee for any reasonable and actual out-of-pocket expenses incurred by Indemnitee in cooperating with the Indemnitor when, and only when, such cooperation has been requested by Indemnitor.

11.7    Duration of Indemnification Obligations. The Parties agree that all representations and warranties contained herein shall survive until the date twenty-four (24) months following the Closing, except that Sections 4.1, 4.2, 4.3, 4.6, 4.11 and 4.14 shall survive indefinitely.

11.8    Indemnification. Notwithstanding any other provision hereof: (a) Seller shall not have any liability with respect to a Claim under Section 11.2 Buyer is solely responsible for Product Due Diligence of Acquired Assets herein.

11.9    Indemnification in Case of Strict Liability or Indemnitee Negligence. The indemnification provisions of this Article 11 shall be enforceable regardless of whether the Claims for which indemnification is sought is based on past or future acts, claims or laws or regulations (including any past or future laws or regulations related to bulk sales, the Environment, fraudulent transfers, occupational safety and health, product liability or securities), and regardless of whether the Party against whom indemnification is sought alleges or proves the sole or concurrent negligence, gross negligence, strict liability or vicarious liability of the Party seeking indemnification.

11.10   Payments. Each Party hereby agrees to pay the amount of established Claims charged against it, to the other Party within five (5) days after the establishment thereof, in cash or wire

25

transfer to a specified account.  The amount of loss established by litigation shall be deemed established, for purposes of payment of interest only, upon the entry of judgment thereon, without regard to the taking of any appeal.

11.11  Other Remedies.  Nothing in this Article 11 is intended to limit any equitable remedies that may be available to the Parties.  Any claims arising under or pursuant to any Ancillary Agreement shall be governed by the indemnification obligations, if any, in the respective Ancillary Agreement under which the claim arises.

## ARTICLE 12
## NON-COMPETITION AND NON-SOLICITATION

12.1  Non-competition by the Seller Group. (a)  For a period of ten (10) years after the Closing Date, Seller's Group shall not, directly or indirectly invest in, own, manage, operate, finance, or control any person engaged in or planning to become engaged in a business competitive *(i.e. Network (Multi Level) Marketing, Direct Marketing, Consumer Web based Marketer, or Consumer Catalog Company)* with the sale of the Acquired Assets referenced herein under Section 2.1 (a) and Schedule 2.1(a).

(a)     Further to the exception set forth herein under Section 2.1 License Grant to Seller and 2.2 Excluded Assets, Seller shall also continue to manufacture, market and sell their Photohydroionization   ("*PHI*") line of HVAC-Units (Different Design) and other commercial/industrial equipment containing this technology (see definition herein) to Seller's Industrial and Commercial Distributors, Dealers, OEM's and Private Label Manufacturing Customers and International Distributors.

(b)     Seller furthers agrees not to sell any Residential, Consumer or Household Product as listed herein under Section 2.1 (a) directly or through their website or to assist any Distributor of Seller to selling Residential Products on their respective websites with the exception of Section 2.2.

(c)     Seller further agrees herein not to sell any products that compete with the residential consumer or household product as listed herein under Section 2.1(a) to any Network (Multi Level) Marketing Company or consumer web based marketing company, consumer catalog company, or infomercial marketing company in the U.S., Canada, Taiwan, Australia or United Kingdom.

(d)     Seller further agrees to refrain from selling any products with the *RCI* Technology and Trademark without prior written consent of the Buyer.

(b)     For a period of ten (10) years after the Closing Date, Seller's Group shall not, directly or indirectly, (i) engage in the Business in the Field or (ii) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Seller on the Closing Date or within the year preceding the Closing Date to cease doing business with Buyer, to deal with any competitor of Buyer, or in any way

26

interfere with its relationship with Buyer or (iii) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Buyer to cease doing business with Buyer, to deal with any competitor of Buyer, or in any way interfere with its relationship with Buyer.

12.2    Non-Solicitation. With the exception of Rick Hill, neither Seller's or Buyer's Groups shall permit their respective companies, Affiliates and their respective directors, officers, employees or agents, for a period of Five (5) years following Closing, to interfere in any way with the relationship between each other's employees, independent contractors, suppliers or consultants or hire, offer to hire, solicit for employment, solicit to leave the employ of the other party or its Affiliates or retain (including as a consultant, independent contractor or leased employee) any employee or independent contractor of Buyer or Seller without the express written consent of Buyer or Seller.

12.3    Non-Disparagement.  After the Closing Date, Seller shall not disparage Buyer, Buyer's engagement in the Business or use of the Acquired Assets or any of Buyer's stockholders, directors, officers, employees or agents.

12.4    Equitable Relief.  The Parties herein acknowledge and agree that the either Party would be irreparably damaged if any of the provisions of Sections 12.1 and 12.2 are not performed in accordance with their specific terms or are otherwise breached.  Accordingly, it is agreed that the damaged Party shall be entitled to an injunction or injunctions to prevent breaches of Sections 12.1 and 12.2 and shall have the right to specifically enforce Sections 12.1 and 12.2 and the terms and provisions thereof against the breaching Party in addition to any other remedy to which damaged may be entitled hereunder, at law or in equity.

12.5    Severability.   It is the intent of the Parties that each of the provisions of this Article 12 be enforced to the fullest extent permissible under the laws and public policies of each jurisdiction in which enforcement of Sections 12.1 and 12.2 is sought.  In furtherance of the foregoing, each provision of this Article 12 shall be severable from each other provision, and if a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in this Article 12 is invalid or unenforceable, then the Parties agree that the court or tribunal shall have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision to make such provision enforceable.  This Article 12 shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.  The Parties agree that this Article 12  is reasonable and necessary to protect and preserve Buyer's legitimate business interests and the value of the Acquired Assets and to prevent any unfair advantage being conferred on Seller.


## ARTICLE 13
## OTHER PROVISIONS


27

13.1    Public Announcements. Subject to the requirements imposed by any Governmental Authority or stock exchange, no press release or other public announcement, or public statement or comment in response to any inquiry, relating to the transactions contemplated by this Agreement shall be issued or made by either Party without the written approval of the other Party, such approval not to be unreasonably withheld or denied. The Parties agree to cooperate in preparing such announcements; except however that this Section 13.1 will not prevent Buyer from filing with the Patent Offices and Intellectual Property Offices in the United States and other countries documents evidencing Buyer's ownership of or rights to the Intellectual Property Assets for official recordation and public notice purposes, and that such filings will not require Buyer to obtain approval, written or otherwise, from Seller.

13.2    Bulk Transfer Compliance. Seller shall not be required to comply with applicable bulk sales laws. Seller shall indemnify and hold Buyer harmless from any cost or liability resulting from any failure to obtain withholding tax clearances and resulting from any non-compliance with applicable bulk sales laws.

13.3    Expenses. Except as otherwise specifically provided herein, Buyer and Seller shall each bear their respective costs and expenses in connection with this Agreement and the transactions contemplated herein, including payment of costs and expenses of their respective counsel and accountants. If this Agreement is terminated, the obligation of each Party to pay its own expenses shall be subject to any rights of such Party arising from a breach of this Agreement by the other Party.

13.4    Assistance in Proceedings; Access to Records. The Parties shall cooperate with each other and their respective counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and records in connection with, any Proceeding involving or relating to (a) any of the transactions contemplated hereby or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving the Acquired Assets.

13.5    Governing Law; Jurisdiction. This Agreement and all questions relating to its validity, interpretation, performance and enforcement (including, without limitation, provisions concerning limitations of actions), shall be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of laws thereof. Each Party irrevocably submits to the exclusive jurisdiction of the courts sitting in the State of Florida, in any action arising out of or relating to this Agreement and all claims in respect of the action shall be submitted to Arbitration in Palm Beach County, Florida pursuant to the Rules of the American Arbitration Association.

13.6    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given, made and received only when delivered personally, by courier service such as Federal Express, or by other messenger or by telefax, addressed as follows:

28

If to Seller, to:
RGF Environmental Group, Inc.
Attention: Ronald G. Fink, President/CEO
3875 Fiscal Court
West Palm Beach, Florida 33404

If to Buyer, to:
EcoQuest International, Inc.
Attention: Michael Jackson, President/CEO
310 T Elmer Cox Drive
Greeneville, TN 37743

or to such other address as any party shall give notice of to the other under this Section.

13.7   Waivers; Amendments. (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)   No failure or delay on the part of any Party in exercising any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.

13.8   Successors; Assignment. Except as expressly provided to the contrary in this Agreement, all provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the successors or permitted assigns of either Party. This Agreement may not be assigned by a Party without the prior written consent of the other, except that a Party may, upon written notice to the other Party, assign this Agreement to a party acquiring all or substantially all of its business or operations with respect to which this Agreement relates with written notice of same; provided, however, that the assignee or transferee assumes in writing such party's obligations under this Agreement. Any assignment shall not relieve the assigning Party of its responsibility for its obligations hereunder.

13.9   Severability. If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby and it is the intention of the Parties that any such provision be reformed so as to make it enforceable to the maximum extent permissible under applicable law.

13.10   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.11   <u>Entire Agreement</u>.  This Agreement and the Schedules and Exhibits attached hereto contain the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements and understandings.  The Ancillary Agreements attached hereto as Exhibits are for reference only and shall control with respect to the matters set forth therein.

13.12   <u>Headings</u>.  Headings in this Agreement are included for reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

13.13   <u>No Third Party Beneficiaries.</u>  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than the Parties and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third Persons or any Party, nor give any third Persons any right of subrogation or action against any Party.

13.14   <u>Interpretation</u>.  Unless the context requires otherwise, all words used in this Agreement in the singular number shall extend to and include the plural, all words in the plural number shall extend to and include the singular, and all words in any gender shall extend to and include both genders.

IN WITNESS WHEREOF, Seller and Buyer have caused this Asset Purchase and Sale Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**RGF ENVIRONMENTAL GROUP, INC.**

By: _____

Name: _____

Title: _____


**ECOQUEST INTERNATIONAL, INC.**

By: _____

Name: _____

Title: _____

31

## DEFINITIONS

**"Acquired Assets"** has the meaning set forth in Section 2.1 hereof and listed in Schedule 2.1(a) attached hereto.

**"Affiliate"** of a Person means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common Control with that first Person. For purposes of this definition, "control" means the power to direct, or cause the direction of, directly or indirectly, the management or policies of the specified Person, whether through the ownership of more than fifty percent (50%) of the voting equity ownership of such person (or securities convertible or exchangeable into more than fifty percent (50%) of such voting equity ownership interest), by contract or otherwise.

**"Agreement"** means this Asset Purchase and Sale Agreement, together with the Schedules and Exhibits hereto, as the same may be amended in accordance with the terms thereof.

**"Ancillary Agreements"** has the meaning set forth in Section 3.2.(e) hereof.

**"Assignment and Assumption Agreement"** means the assignment and assumption agreement between Seller and Buyer to be executed at Closing, substantially in the form of Exhibit A attached hereto.

**"Assumed Liabilities"** has the meaning set forth in Section 2.3 hereof.

**"Bill of Materials"** means a list describing the equipment, parts and components used in constructing the Acquired Assets that the Buyer is purchasing, including their technical specifications, size, operating conditions, manufacturer, model numbers and supplier(s).

**"Bill of Sale"** means the bill of sale between Seller and Buyer to be executed at the Closing, substantially in the form of Exhibit B attached hereto.

**"Business Day"** means a day other than Saturday, Sunday or a day on which banks are legally closed for business in New York, New York, USA.

**"Business"** means the business of developing, designing, manufacturing and selling food safety products and technologies all as operated, prior to and including the Closing Date, by Seller.

**"Buyer"** has the meaning set forth in the preamble to this Agreement.

**"Buyer Group"** means Buyer and its Affiliates, and each of their respective stockholders, partners, members, officers, directors, employees, attorneys, representatives, agents, successors and assigns.

**"Certified Commercial Distributor"** (CCD) means an Independent Contractor authorized to represent the RGF® name and to sell and service RGF's commercial products to industrial and commercial customers for air, water and food purification applications as set forth in the RGF Commercial Distributor Program Guide. Commercial Distributor becomes certified by taking

32

RGF's advanced oxidation technical training self-study course and attending a two (2) day technical sales training seminar at RGF headquarters.

**"Claim(s)"** means all Proceedings, costs, damages, demands, expenses (including reasonable legal, accounting and other expenses), fines, interest, losses, penalties, and liabilities, threatened, asserted or otherwise made by either Party or a third party against the other Party, excluding (a) any such items with respect to which the other Party has agreed to provide indemnification, or which the other Party has agreed to assume pursuant to this Agreement, and (b) any punitive, incidental, indirect, special or consequential damages, including damages for lost revenues, income, profits or tax benefits, or diminution in value.

**"Closing"** has the meaning set forth in Section 3.1 hereof.

**"Closing Date"** has the meaning set forth in Section 3.1 hereof.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Consumer Based Web Marketer"** means a business, entity or person that markets and sells a specific product for personal, residential or household use direct to consumers or individuals via the internet and/or their specific web page or website.

**"Contract"** has the meaning set forth in Section 2.1(c) hereof.

**"Encumbrances"** has the meaning set forth in Section 4.6 hereof.

**"Excluded Assets"** means those assets which the Seller shall retain exclusive rights herein including the following: Seller's patent-pending technology known as Photohydroionization "PHI" or "PHI-Cell" defined herein under Definitions and RGF's Commercial and Industrial products containing that technology including, but not limited to: Commercial APS, APS Mini, HVAC PHI Cell, Commercial Food Sanitizer, Turbozone 1000/7000, BOS Bacteria/Odor Abatement System, Compactor BOS II, Indoor Compactor BOS III, RGF's Plug In, Ice Machine Sanitizer, Mobile Pro Plus, Bio Ox Grease System, Industrial Laundry System, Advanced Oxidation Fluid and Purification Systems, Ozone water treatment systems, RGF's entire wastewater and water treatment and recycling systems product line, marine product line, and industrial food safety product line and the products set forth in RGF's 2003-2004 Equipment Catalog. See also Section 2.1(b) License Back to RGF.

**"Governmental Action/Filing"** means any franchise, license, certificate of compliance, authorization, order, permit, approval, consent or other action of, or any filing, registration or qualification with, any Governmental Authority.

**"Governmental Authority"** means any federal, state, local or other governmental, regulatory or administrative agency, commission, department, board, or other governmental subdivision, court, tribunal, arbitral body or other governmental authority.

**"Indemnitee"** has the meaning set forth in Section 11.4 hereof.

33

"**Indemnitor**" has the meaning set forth in <u>Section 11.4</u> hereof.

"**Industrial and Commercial Distributors**" means professionals owning their own business, which business promotes the sale of commercial or industrial equipment or products containing RGF's PHI Technology to other *merchants, or industrial, government, institutional, and commercial users* mainly for resale or business use. Said businesses shall include, but not be limited to: Suppliers to National Accounts for restaurants, hotels/resorts, cruise lines, hospitals/assisted living facilities, airports, transportation, sporting arenas, wholesale and business-to-business commercial and industrial suppliers, heating/air conditioning and ventilation, mechanical engineers, contractors and government services administration. Said businesses shall not include (i) any Network (Multi-Level) Marketing Companies (see definition herein), in direct competition with Buyer (ii) any persons or entities known by Seller to market or sell in the United States, Canada, Taiwan, Australia, or United Kingdom direct to consumers via websites, infomercial, consumer catalogs or mail order, or (iii) any persons or entities selling any product in direct competition with the products being transferred herein under Section 2.1(a) to large retail superstores including without limitation to such stores as Wal-Mart, Costco, BJ's, Sam's Club, Home Depot in the United States, Canada, Taiwan, Australia, or United Kingdom.

"**Intellectual Property Assets**" has the meaning set forth in <u>Section 2.1(a)</u> hereof.

"**Intellectual Property and Trade Secret Assignments**" means the intellectual property and trade secret assignment agreement between Seller and Buyer to be executed at the Closing, substantially in the form of Exhibit D attached hereto.

"**International Reps and Distributors**" means professionals owning their own business, which business promotes the sale and distribution of commercial or industrial equipment or products, and is located and does business outside the United States or Puerto Rico.

"**Light Commercial**" means a small business which promotes the sale of consumer or household retail products and/or personal or household services such as; carpet cleaning, retail shop, nail salon, drinking establishment, local restaurant, small grocery store, small offices etc.

"**Material Contracts**" has the meaning set forth in <u>Section 4.5</u> hereof.

"**Network Marketing Companies**" (a/k/a "Multi-Level Marketing" or "*MLM*") means a system of retailing in which products are sold direct to the general public for personal or household use by independent sales representatives and members of the selling network are encouraged to recruit additional people (adding more "levels" to the network) and receive compensation for recruiting, training and/or managing these recruits.

"**Notice of Claim**" has the meaning set forth in <u>Section 11.4</u> hereof.

"**OEM**" means an international manufacturing firm that produces an original or specific product and distributes that product to more than one company in the same industry.

34

"**Party**" means either Seller or Buyer, as the context requires; "**Parties**" means collectively, Seller and Buyer.

"**Permits**" means all certificates, licenses, permits, approvals, consents, orders, decisions and other actions of a Governmental Authority pertaining to a particular Acquired Asset.

"**Person**" means an individual, partnership, joint venture, corporation, limited liability company, trust, association or unincorporated organization, or, if the context so requires, any Governmental Authority.

"**Photohydroionization**" ("*PHI*") means the combination of safe, low-level ozone (O3) and UV light enhanced by a hydrated quad metallic compound target, which develops an advanced oxidation reaction producing hydro peroxides, super oxide ions, ozonide ions and hydroxides.

"**Private Label Customers**" means professionals owning their own business, which business promotes the sale and distribution of commercial or industrial equipment or products under their own brand name.

"**Proceedings**" has the meaning set forth in Section 2.4(h) hereof.

"**Purchase Price**" has the meaning set forth in Section 2.5 hereof.

"**Radiant Catalytic Ionization**" ("*RCI*") means High intensity UVX Wavelength with a surrounding purifying plasma grid ("RCI"). Consists of a high energy broad spectrum UV light (UVX) which contacts a hydrated six-metallic Hydrophilic coated honeycomb catalytic matrix (target) of titanium dioxide and noble rare metals and a hydrating agent, resulting in a purifying plasma of advanced oxides and ions.

"**RGF Prototypes**" means the prototype models of RGF products set forth in Schedule 2.1(b) hereof.

"**Records**" means all books, books of account, engineering plans, designs, specifications, documents, drawings, historical process data, maintenance records and similar record-keeping materials, all client and customer lists, referral sources, production reports and records, service and warranty records, equipment logs, operating guides and manuals, financial and accounting records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents regardless of the type of medium on which stored, excluding same to the extent comprising, containing or relating to the Excluded Assets.

"**Regulatory Approval**" means any material consent, approval, authorization, action by or any registration, filing with or notice to any Governmental Authority.

"**Release**" means release, spill, leak discharge, dispose of, pump, pour, emit, empty, inject, leach, dump or allow to escape into the Environment.

"**Remediation**" means any or all of the following activities to the extent they relate to or arise from the presence of Hazardous Substances at the Leased Premises or in connection with the Acquired Assets or Corona Discharge Ozone Systems: (a) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, response or restoration work; (b) obtaining any permits, consents, approvals or authorizations of any Governmental Authority necessary to conduct any such activity; (c) preparing and implementing any plans or studies for any such activity; (d) obtaining a written notice from a Governmental Authority with jurisdiction over the same under Environmental Laws that no material additional work is required by such Governmental Authority; (e) obtaining a written opinion of state law requirements; and (f) any other activities reasonably determined by a Party to be necessary or appropriate or required under Environmental Laws to address the presence of Hazardous Substances at the Leased Premises or in connection with the Acquired Assets or Corona Discharge Ozone Systems.

"**Retained Liabilities**" has the meaning set forth in <u>Section 2.4</u> hereof.

"**Seller**" has the meaning set forth in the preamble to this Agreement

"**Seller's Group**" means Seller and its Affiliates, and each of their respective stockholders, partners, members, officers, directors, employees, attorneys, representatives, agents, successors and assigns.

"**Tax**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Internal Revenue Code of 1986, as amended), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property (including assessments, fees or other charges based on the use or ownership of real property), personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated tax, or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not, including any item for which liability arises as a transferee or successor-in-interest.

"**Third Party Claim**" means a claim by a Person that is not a member of the Seller Group or the Buyer Group, including any claim for the costs of conducting Remediation, or seeking an order or demanding that a Person undertake Remediation.

"**Trade Secrets**" has the meaning set forth in <u>Section 2.1(a)</u> hereof.

36

# LIST OF SCHEDULES AND EXHIBITS

## SCHEDULES

| 2.1(a) | List of Acquired Assets |
|---|---|
| 2.1(b) | List of RGF Prototypes |
| 2.1(c) | Sample Short List of RGF Distributors-Commercial Industrial Sectors |
| 2.1(d) | Photo Visual Differential of RCI and PHI-Cell |
| 4.12 | List of Products/Inventions for Bill of Materials Provided |
| 4.15 | Regulatory Approvals |
| 5.4 | Buyer's Conflicts |
| 5.5 | Buyer's Litigation |
| 5.6 | Buyer's Regulatory Approvals |

37

## Schedule 2.1(A)
## INTELLECTUAL PROPERTY ASSETS

### TRADEMARKS

**Exclusive Trademarks**
- RCI™ Radiant Catalytic Ionizer
  Number 78/339.543

  Application filed with PTO 12/11/03. Serial
- UVX™

  Application pending

### PATENTS

- None filed

## INVENTION RECORDS/DISCLOSURES

**RCI™ Proprietary Technology**
- Radiant Catalytic Ionization (RCI™) – High intensity UVX Wavelength with a surrounding purifying plasma grid ("RCI"). Consists of a high energy broad spectrum UV light (UVX) which contacts a hydrated six-metallic Hydrophilic coated honeycomb catalytic matrix (target) of titanium dioxide and noble rare metals and a hydrating agent, resulting in a purifying plasma of advanced oxides and ions.

**Products/Inventions _containing_ RCI™ Proprietary Technology**
- Refresh (Refrigerator Unit)
- Residential Laundry Pure
- HVAC-RCI Probe Residential 3,000*
- HVAC-RCI Probe Residential 8,000*
- HVAC RCI Probe Residential 30,000*
- Mini Food Pure
- APS Commercial – Air Purification System**
- APS Mini – Air Purification System**
- PIP (Plug In Plus)**

38

**Products/Inventions _not containing_ RCI™ Proprietary Technology**
- Spot Not – Ionic Water Filter
- O23 Oxygen Enhancement Unit
- Commercial Ozone System – a/k/a Turbozone®   1000***
- Mobile Pro – UV light based ozone generator ***
- Electro Static Catalytic HVAC Filter – Central Heating/Air Conditioning ***

**Note\*** _RGF will retain the exclusive right to continue to manufacture and distribute a commercial sized HVAC Air Purification unit containing RGF's patent pending PHI –Cell Technology worldwide via Industrial and Commercial Distributors as per Section 2.2 Excluded Assets (see Definition of "Industrial and Commercial Distributors" herein, and see Schedule 2.1(d) Photo for Visual Differentiation of RCI and PHI-Cell.)_

**Note\*\*** _Subject to Section 2.1(b) License Grant to Seller, Buyer will license to Seller and Seller shall retain the exclusive right to continue to manufacture and distribute a unit with a similar or like kind exterior housing containing RGF's PHI –Cell Technology worldwide via Industrial and Commercial Distributors. (see Definition of "Industrial and Commercial Distributors herein.)_

**Note\*\*\*** _Subject to Section 2.1(c) License Grant to Seller, Buyer will License to Seller and Seller shall retain the exclusive right to continue to manufacture, market and sell worldwide these products/Inventions via industrial and commercial distributors (see Definition of "Industrial and Commercial Distributors" herein._

# TRADE SECRETS

Information pertaining to operations and capabilities of the assets on this Schedule 2.1 (a) and any design and operations information pertaining to the Invention Records/Discloures.

39

## SCHEDULE 2.1(b)

## RGF PROTOTYPES

PIP

Food Pure

APS

APS-Mini

Spot Not

Guardian Air

Mobile Pro

HVAC-RCI Probe 3,000

HVAC-RCI Probe 18,000

Refrigerator Pure

40

## SCHEDULE 2.1(c)

## <u>SAMPLE SHORT LIST OF RGF DISTRIBUTORS- COMMERCIAL/INDUSTRIAL<br>SECTORS</u>

IISES, LLC –U.S., Canada, Puerto Rico. National Accounts - Hotels, Resorts, Cruise Lines, , Institutional Food Service, Hospitals, Airports and Sports Facilities

BP Air – Metro-New York City. Heating Ventilation/AC MechanicalContractors. High rise office buildings, commercial/industrial establishments (Certified Commercial Distributor)

Lamers Industrial Cleaning – EU – Netherlands. Master Distributor-floor scrubbers, carpet cleaners, clean air (Turbozone), HVAC units, ECO Air, etc. CE Mark, private label

Certified Commercial Distributors – throughout the United States

Ozone Systems UK – Distributor of industrial systems. Sterotrox-ind. Food processing, clean rooms, RGF Commercial Air, PHI, water-advanced oxidation, food safety systems-food, surface (belt sanitation) air and water

Far East-China/Hong Kong, Shanghai – Non-exclusive commercial-High rise office buildings, subway stations, etc.

Besqua Technologies- Penang, Malaysia – factories, bars, restaurants

41



ECOQUEST RCI UNIT

RGF PHI UNIT



ECOQUEST RCI UNIT

RGF PHI UNIT



## SCHEDULE 4.12

## LIST OF PRODUCTS/INVENTIONS – BILL OF MATERIALS PROVIDED

All products/inventions as listed under Schedule 2.1(a) herein except for O23 Oxygen Enhancement System.

Note: O23 is currently being re-designed due to high cost.

42

## SCHEDULE 4.15

## REGULATORY APPROVALS

Certified Indoor Air Quality – Walter Ellis
Certified Mold Inspection – Ron Fink

Hazardous Waste Mgr. Certificate - Ronald G. Fink
Radiation Safety Officer Certificate - Ronald G. Fink

EPA Registered
U.L. Approval
CE Mark for Turbozone® under Private Label "Clean Air" through European Union
FDA Protocol Approval of Food Sanitation Program

43

IN WITNESS WHEREOF, Seller and Buyer have caused this Asset Purchase and Sale Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**RGF ENVIRONMENTAL GROUP, INC.**

By: _R. G. Fink_

Name: _R.G. Fink_

Title: _PRESIDENT_

**ECOQUEST INTERNATIONAL, INC.**

By: _____

Name: _____

Title: _____

-30-

IN WITNESS WHEREOF, Seller and Buyer have caused this Asset Purchase and Sale Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**RGF ENVIRONMENTAL GROUP, INC.**

By: _____

Name: _____

Title: _____

**ECOQUEST INTERNATIONAL, INC.**

By: _Michael Jackson_

Name: _Michael Jackson_

Title: _President / CEO_

-30-

# COMPOSITE EXHIBIT "B"

# Welcome!

## Dear activTek Business Owner,

Thank you for becoming part of the activTek family. We are committed to doing all we can to make your participation in the commercial market rewarding, both financially and from an impact perspective.

activTek Environmental is located in Greeneville, Tennessee, and markets and sells air and water purification products to the commercial market and to residential new construction. We only sell through our network of independent business owners who are certified and trained by the company to represent our products and our brand. Our products are used today to create a healthy environment for visitors to the Ground Zero Museum in New York City, the Liberty Bell, to schools and hospitals around the country, and to over 5 million homes and other commercial facilities around the globe.

activTek was established in 2007 as an independent business unit in order to present a true commercial presence to commercial business customers. However, our compensation systems and recognition and reward programs connect us to the EcoQuest organization in a way that is transparent to the commercial customers. This approach gives you both the advantages of operating as a commercial business venture in our chosen markets and the ability to earn income, rewards, and recognition based on the team based approach inherent in the MLM compensation structure.

Most of those who participate in the commercial division have some background in heating and air conditioning, general contracting, building trades, or architecture. If you don't have these skills in your background, we suggest that you align yourself with someone who does and can assist you with the technical aspects of our equipment and the market dynamics of the commercial markets. We do offer substantial training to our commercial business owners in order to insure that our brand and products are represented in a professional manner in the market. All commercial business owners are required to pass a self study course. Additional training is required based on your level of commitment to the commercial market. Full details of the training requirements are included in this handbook.

We are committed to providing the highest quality products and services to our business owners and to our chosen commercial markets. Please let us know if there is anything we can do to assist you in reaching all of your activTek sales and growth goals.

Thank you again for joining our family. We long forward to a long and mutually prosperous partnership.

## Rick DeMarco
Vice President and General Manager of activTek Environmental



activTek

ENVIRONMENTAL

## activTek Environmental Highlights of the Strategy

At the 2007 convention in Columbus, Ohio, we rolled out the strategy for the newly formed commercial division of EcoQuest International. We realize that some of you were unable to make it to the convention, so this document has been put together to summarize the key points of that strategy.

First the new name of the commercial division is activTek Environmental. We have established activTek Environmental as a corporation registered in the state of Tennessee under the ownership of EcoQuest International

activTek was set up as its own corporation because the commercial business requires different processes, procedures, and marketing strategies to go to market, different pricing and logistic requirements tailored to the commercial business sector, and a separation from an MLM environment that often becomes a hindrance to securing commercial business.

There are two overriding themes to everything we presented at convention and everything we are going to talk about regarding the direction of commercial:

1.    *It is always the business owner's choice regarding how he/she wants to participate in the commercial market and how he/she wants to handle any customer. We are simply presenting alternatives that allow a business owner to take full advantage of an opportunity. You may have heard about house accounts or national accounts. We will never force you to do anything with an account that you don't want to do.*

2.    *We have established a strategy that presents activTek to the market place as a true commercial enterprise, while at the same time, maintaining the compensation and sponsoring structure that is part of our MLM heritage and commitment to our business owners. Business owners will continue to earn PV/QV on their down lines and will be able to recruit other commercial business owners. However to the customer, we will simply look like a commercial company selling air and water purification products.*

Although, again, it is always the business owners choice regarding the approach to participating in activTek, our strategy is to establish the activTek business owner as THE EXPERT in the market on air and water quality and therefore, the implications to the commercial business owner are that the training requirements, expertise, and resources required to succeed are greater than in the MLM side of the business. In other words, commercial is not a get rich quick scheme and it is clearly NOT for everyone.

So let me touch on a few highlights of the strategy

10/26/07

Because the commercial market is so broad, we have identified five vertical markets that we will target.

1. Heating and Air Conditioning
2. Residential New Construction
3. Health and Medical Facilities
4. Food Service and Restaurants
5. General Commercial

We have developed processes, procedures, pricing strategies, and product strategies to address the unique nature of EACH of these 5 markets. Historically, we have not been as aggressive in the health and medical markets and the food service markets because we lacked a solid understanding of how to succeed in these markets. We are now establishing relationships with people who know these markets and identifying the right approach to leverage the opportunities. We have had expertise in HVAC and residential construction, so we historically focused our attention on these segments

Our product strategy is to meet the market place needs with high quality products at the lowest possible cost. Specifically, we will:

Continue to differentiate commercial products from residential both in physical appearance and in naming in order to manage any potential channel conflict. For example, the Ductworx product on the residential side is sold as the Induct product in commercial. Furthermore, since the 9 inch is the one that is sold in both divisions, we are changing the commercial unit to look like the rest of the line of commercial induct products.

Identify specific products required to participate in each of the 5 vertical markets and look for new products to close any product offering gap.

We will place a bold sticker on products requiring installation that indicates that the product must be installed by a professional contractor or the warranty will be void

The old Eco Certified and Enviro Certified programs have been redone to become the Certified for Healthy Living Program. We have prepared certificates and door and window labels for those facilities that meet the certification requirements. In addition, we have designed a high quality weatherproof brass/copper plaque which can be purchased by the customer for display on the actual building that is certified.

In activTek, there will be three commercial business owner status positions. These are not be confused with the MLM rank which dictates the pricing and incentive programs that are tied in to EcoQuest International. These ranks identify the level of qualification of the commercial business owner and define the training requirements, as well as the services provided by the company. The three positions are:

**Commercial Dealer**
Activation fee of $299
Must complete a self study course
Must attend a one day training program
$299 is an annual renewal fee because continuing education is required

10/26/07

## Commercial Account Manager

Activation fee of $2995
Covers the first 2 years
Monthly fee to be determined beginning in the third year
Must complete self study course
Must complete a 3 day intensive training course
Personalized website
Access to extended network of experts
Priority service

## National Commercial Account Manager

Same as account manager
Gold level of customer service....dedicated 800 number
Extension of our staff to work on large accounts and help business owners on smaller ones

The level in which you participate in activTek is entirely your choice. Most of our commercial business owners will probably stay in the $299 category. If you need additional expertise and tools to grow the commercial business, you may consider the account manager status

**There are three ways in which you can participate in the commercial business.**

### Partner with a commercial business owner

Opportunistic deal
Partner with a commercial business owner and share the earnings

### Commercial Dealer

Account belongs to you
You must be a commercial dealer
Responsible for logistics and service of the account
Compensated by margin difference between your purchase price and your selling price AND PV/QV

### Large National Account

Demands that exceed a business owner's capacity
Pricing and logistics worked out between the customer, activTek and the Business owner
Commercial dealer is compensated with PV/QV, similar to a traditional commission structure....commission on large volumes

**The pricing strategy for activTek is characterized by the following:**

One price
Volume rebates earned based on your rank
Large commercial accounts demand customized pricing
Dollars are needed to support large account needs, i.e. advertising coop, logistics support, etc., so PV will be adjusted based on mutual agreement

10/26/07

The Distributor Policies herein are designed to provide you – the Commercial Distributor (hereafter referred to as Distributor) with information necessary to represent the activTek Environmental (hereafter referred to as the Company) name and to sell and service commercial products to commercial customers as an Independent Contractor. The Distributor Policy is incorporated into, and form an integral part of, the Distributor Agreement. The Company reserves the right to amend the Distributor Agreement (including these Distributor Policies) and its prices in its sole and absolute discretion. By entering into the Distributor Agreement, you agree to abide by all amendments that the Company elects to make. Amendments shall be effective upon notice to all Distributors that the Distributor Agreement has been modified. Notification of amendments shall be given to all Distributors by one or more of the following methods: (1) posting on the Business Owner Login section of the Company's official web site; (2) electronic mail (e-mail); (3) inclusion in Company periodicals; or (4) special mailings. Your continuation as a Distributor and failure to cancel your Distributor Agreement following such notification constitutes your acceptance of any and all amendments.

**1) Terms and Conditions:**
a) Distributor agrees to conduct business in a professional, businesslike manner at all times while marketing and selling the Company equipment or conducting installations and service for the Company customers.
b) The Company shall not be responsible for any claims arising out of any advertising, verbal statements or representations by Distributor that are not officially approved by the Company in writing. The Distributor shall hold harmless and indemnify the Company for any damages or expenses caused as a result of any such unapproved communications.
c) No Distributor has the power or authority to bind the Company or make promises or representations on behalf of the Company to third parties without the prior written consent of the Company.
d) The Company reserves the right to deny any prospective Distributor's plication herein and to suspend immediately and terminate permanently any Distributor upon 30 days prior written notice should the Distributor violate any of the terms, conditions, or any policies stated herein.
e) The Distributor Agreement between the Company and Distributor does not create an employer/employee relationship, agency, partnership, or joint venture between the Company and Distributor. Distributor shall not be treated as an employee for Distributor's services or for Federal or State tax purposes.
f) Distributor will obey all laws pertaining to the operation of its business including any applicable licensing fees or taxes required by local, state, or federal agencies. Distributor is responsible for paying local, state and federal taxes on any income generated as a Distributor. Every year, the Company will provide an IRS Form 1099 MISC (Non-employee Compensation) earnings statement to each Distributor who: 1) Had earnings of over $600 in the previous calendar year; or 2) Made purchases during the previous calendar year in excess of $5,000.

**2) Product Pricing will be mandated per the Company's latest published pricing guide.**
a) The Company reserves the right to amend this pricing structure at any time without prior notification to Distributors
b) It must be clearly understood that large National Accounts may require more favorable pricing and/or require that the Company be involved in the order negotiations. For purposes of these Policies, a National Account shall be defined as an account that is so designated by both the Distributor who established the relationship with the potential customer and activTek, based on an assessment of that customer's needs and the ability of the Business Owner to meet those needs without the assistance of activTek. Upon contacting such a business or Customer, the Distributor agrees that Distributor shall immediately contact the Company to determine whether or not the business or customer is considered a National Account. If the business or customer is a National Account, as determined by the Company at its sole and absolute discretion, the Distributor

agrees that the Company shall take over the account.
c) It should be understood that the pricing and any applicable commissions may be negotiable on these National Account orders, and any and all discount modifications must be agreed to in writing.
d) The Company publishes the Mandatory Retail Price (MRP) of all its products and no Distributor may undersell that price without prior written approval of the Company in its sole discretion.
e) Net 30 Terms Requirements
  i) Distributor will use the standard order forms – which list minimum MRP
  - provided by the Company for placing orders.
  ii) Distributor's customers may be eligible for Net 30 Terms if they submit a Company Credit Application Form and are confirmed credit worthy. A finance charge shall be imposed on any balance not received within thirty (30) days. The finance charge is a periodic monthly rate of 1.5%, corresponding to an 18% annual rate. Payments made against past due balances using a credit card will be assessed a 2.5% surcharge.



**3) Commercial Sales Training**
a) Distributor agrees to register for and complete the Self-Study Course and pass an exam with a minimum acceptable score –of at least 70% – registering for the required commercial training.
b) The Distributor agrees to attend, as soon as is practical, the Company's commercial training program – currently one day in duration.
c) Commercial Account Managers are required to complete an additional two days of advanced training.

**4) Shipping and Freight**
a) All freight will be shipped prepaid or UPS Ground unless otherwise agreed to in writing by the contracting parties. The price quoted and charged for freight is based on estimated weight and current carrier listing and may be subject to changes.
b) Not withstanding any other terms herein, the risk of loss to the systems shall be upon the carrier until said product is received and inspected by the purchaser/deliveree.
c) If shipment is received with damaged or missing parts, the purchaser/deliveree should contact the Company for further instructions in order to rectify the problem.

**5) Service and Installation**
a) Distributor is required to provide installation and ongoing service, if required to customers. Distributor should have a trained service technician to conduct periodic service calls or installations when required for the commercial products.
b) Distributor agrees to train in accordance with the Company's instructions and procedures the personnel designated by the Distributor concerning the proper installation and service of the products when necessary.

**6) Warranty, Performance Guarantee, and Returns**
a) The Company offers a Limited Warranty on all commercial products. Warranty periods vary based on products and therefore current published literature specific to that product should be consulted.
b) It is the customer's responsibility to return warranty items to the Company and the Company will pay for the shipping back to the customer for warranty returns.
c) Requests to return unused products after 90 days for whatever reason must be preceded by a written request submitted to the Company. The return may be implemented upon an acknowledgment and consent of return signed by the Company.
d) These returns will be at the sole discretion of the Company and are subject minimum to a 10% restocking fee:
  i) All items returned must be currently offered in the latest published catalog and;
  ii) Products must be returned in unopened boxes in new, sellable condition.
  iii) A 10% restocking fee is incurred for all returns.

iv) The customer is responsible for all shipping fees.

v) All PV/QV are deducted for returned items to recover bonuses paid to uplines.

vi) If products are received and deemed to have been used, the products may be depreciated between 50%-75% based on activTek's evaluation.

e) If a Distributor resigns from the Company or whose relationship to the Company is terminated for any reason, the Distributor may return all products and marketing materials purchased within the past 12 months for a full refund less a 10% restocking fee and less any Bonuses paid to the Distributor.

i) Only unopened, complete packages in resalable condition may be returned.

ii) An RMA (Return Material Authorization) must be obtained before shipping items back to the Company. You may obtain an RMA by calling Commercial Support service at 866-736-0503.

### 7) Trade Shows, Marketing Materials, Distributor Websites

a) Distributor is permitted to display Company products at regional trade shows for industry sectors in which they are primarily focused. However, the Company permits only one Distributor to participate in any such trade show. Before submitting a deposit to the event promoter, Distributor must contact the Company in writing for conditional approval. Approval will be granted to the first Distributor who submits an official advertisement of the event, a copy of the contract signed by both the Distributor and the event official, and a receipt indicating that a deposit for the booth has been paid. Approval is given only for the event specified.

b) The Company cannot guarantee referrals back to Distributor when a lead is generated from a trade show. The Company will use best efforts to send leads and inquiries back to the appropriate Distributor.

c) The Distributor is granted the right to use the Company's trademarks, trade names and logos unless the Company notifies the distributor otherwise.

### 8) Notices, Arbitration, Governing Law Tennessee, Jurisdiction and Venue

) Any notices to the activTek Environmental Company shall be sent to the Company's corporate offices in Greeneville, TN. Notices to Distributor shall be sent to the Distributor's address on file with the Company.

b) Any controversy or claim arising out of or relating to the Distributor Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Distributor waives all rights to trial by jury or by any court. All arbitration proceedings shall be held in the City of Greeneville, Tennessee. There shall be one arbitrator, an attorney at law, who shall have expertise in business law transactions with a strong preference being an attorney knowledgeable in the direct selling industry, selected from the panel which the American Arbitration Association provides. The prevailing party shall be entitled to receive from the losing party OR Each party to the arbitration shall be responsible for its own - costs and expenses of arbitration, including legal and filing fees. The decision of the arbitrator shall be final and binding on the parties and may, if necessary, be reduced to a judgment in any court of competent jurisdiction. This agreement to arbitration shall survive any termination or expiration of the Agreement.

c) Nothing in the Distributor Agreement or these Policies shall prevent the Company from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction, permanent injunction or other relief available to safeguard and protect the Company's interest prior to, during or following the filing of any arbitration or other proceeding or pending the rendition of a decision or award in connection with any arbitration or other proceeding.

d) Jurisdiction and venue of any matter not subject to arbitration shall reside exclusively in Greene County, State of Tennessee. The Federal Arbitration Act shall govern all matters relating to arbitration. The law of the State of Tennessee shall govern all other matters relating to or arising from the Distributor ` greement.

### 9) Product Volume Rebates

a) The Company lists only one price for each product regardless of quantity purchased.

b) Each Distributor will receive a rebate based on their personal volume during the month following payment for the products the previous month.

c) As each volume level is achieved, the Distributor will continue to receive that percentage rebate as long as they remain in good standing with the Company.

### 10) Certified for Healthy Living

a) Any commercial establishment that installs all of the air, food, and water purification equipment available and appropriate for their type venue may be awarded a Certified for Healthy Living Certificate.

b) Distributor is responsible to initiate and complete all necessary procedures to accomplish this endeavor.

### 11) Exclusive Territories and Customers

a) There are no exclusive territories granted to any Distributor. No franchise fees are required.

b) The Company, in its sole discretion, may grant exclusive rights to a Distributor to conduct all business with a particular customer, and each Distributor will not attempt to transact business with any third party so designated.

### 12) Delays

The Company shall not be responsible for delays or failures in performance of its obligations when performance is made commercially impracticable due to circumstances beyond its reasonable control. This includes, without limitation, strikes, labor difficulties, riot, war, fire, death, curtailment of a party's source of supply, or government decrees or orders.

### 13) Waiver

The Company never gives up its right to insist on compliance with the Agreement and with the applicable laws governing the conduct of a business. No failure of the Company to exercise any right or power under the Agreement or to insist upon strict compliance by Distributor with any obligation or provision of the Agreement, and no custom or practice of the parties at variance with the terms of the Agreement, shall constitute a waiver of the Company's right to demand exact compliance with the Agreement. Waiver by the Company can be effectuated only in writing by an authorized officer of the Company. The Company's waiver of any particular breach by Distributor shall not affect or impair the Company's rights with respect to any subsequent breach, nor shall it affect in any way the rights or obligations of any other Distributor. Nor shall any delay or omission by the Company to exercise any right arising from a breach affect or impair the Company's rights as to that or any subsequent breach. The existence of any claim or cause of action of Distributor against the Company shall not constitute a defense to the Company's enforcement of any term or provision of the Agreement.

### 14) Severability

If any provision of the Agreement, in its current form or as may be amended, is found to be invalid or unenforceable for any reason, only the invalid portion(s) of the provision shall be severed and the remaining terms and provisions shall remain in full force and effect. The severed provision, or portion thereof, shall be reformed to reflect the purpose of the provision as closely as possible.

### 15) Errors or Questions

If Distributor has questions about or believes any errors have been made regarding commissions, bonuses, orders, or charges, Distributor must notify the Company in writing within 60 days of the date of the purported error or incident in question. The Company will not be responsible for any errors, omissions or problems not reported to the Company within 60 days.

1:4

| Home (Welcome Page) | ABC List of Links | Email Central | Consumables Menu |
|---|---|---|---|
| Price List | 15 Minute Presentation | Umbrella Presentation | Conferences Calls |

# Official EcoQuest Sites

Giddens' favorites marked with  ...

## Preferred Customer/Triple A links

This is used for getting a Preferred Client number -- http://www.ecoquestintl.com/epcapp/epc-app-intro-next.asp -- This is used for getting a Preferred Client number [the webpage uses some wrong terminology that will be corrected later; the person is becoming a Preferred Client (30% discount), not a Preferred Customer (15% discount)]. *** The seller's Dealer # is needed for getting this started. *** A 6-digit Preferred Client number is assigned at the top of the final page but that number cannot be used immediately. It will work within 24 hours. *** A $15 Preferred Client Enrollment Fee will be required after March 21, 2005 -- for now, this enrollment (which generates the 30% discount) is free.

This page is used for placing an initial Triple-A order or modifying an existing order -- https://www.ecoquestintl.com/aaa/ -- This page is used for placing an initial Triple-A order or modifying an existing order. A Dealer Number or Preferred Client Number is required, as is a security code. When a Preferred Client enters the first time a security code will be assigned.

This link will walk you through the Preferred Client and Triple-A steps -- www.to_register_preferred_triplea.htm

Review trainings offered via the Global Communicator -- http://www.ecoquestintl.com/global%5Fcommunicator/

# Infinity2

Here is a good explanation of -- How to read Supplement labels: http://shirley.infinity2.info/education/pdf/1649.pdf

 Here is the new clinical study on TED: http://shirley.infinity2.info/research/pdf/1921.pdf

 Here is a great article on Cellular Nutrition:
http://shirley.infinity2.info/research/pdf/9220.pdf

 Here is the research study proving the Efficacy of Infinity2 Enzymes:
http://www.infinity2.net/office/docs/1920.pdf

 www.infinity2.info -- more information on technical bulletins, research papers, etc.

---

http://www.ecoquestintl.com/dlrsup/eqil/default.htm -- EcoQuest Information Library

 http://playaudiomessage.com/play.asp?m=48916&f=SKQAXH&ps=3&c=FFFFFF&pm=2&h=25 --Great Mike Jackson radio interview on the benefits of Indoor Air Purification.

http://www.ecoquestintl.com/dlrdown/website_forms/incomedisclosure.pdf --Our unique disclosure page shows all income    details. No other MLM offers such a complete disclosure.

 http://www.ecoquestintl.com/poweruplist.asp --Register your Power-up presentations (meetings, one-on-ones, phone, website, DVD, etc.). By logging large numbers of presentations you may qualify for an Extravaganza Night (prizes include an automobile lease, cruises, home electronics, home spas, etc.) at the Orlando Leadership Convention in 2005.

 EcoQuest Company Home Site -- http://www.ecoquestintl.com/

Doug Jackson Site -- http://www.prospectingclinic.com/ -- PROSPECTING CLINIC puts a laser beam on dozens of ways to have as many contacts as you have time to approach and pursue. Whom to contact, How to break the ice, and What to say are big issues. This Site offers some good answers. Giddens Schedule has details about Doug's upcoming Prospecting Clinics.

M.A.C. Services -- https://www.ecoquestmac.com/index2.html Your EcoQuest personal secretary, your link to training and motivation, and

your one source for unique EcoQuest Authorized logo merchandise.

Best Finance, Inc. -- http://www.bestinvesttn.com/
An independent finance company. Our business affiliation is to provide a source of financing for the dealers and customers of EcoQuest International.

EcoQuest Information Library --
http://www.ecoquestintl.com/dlrsup/eqil/default.htm
Company documents about many different questions you may have. Password=eqinfo

Download this information about trading an old Alpine or EcoQuest unit for a new model. Or you may turn in a competitor's air filter, air purifier, HEPA system, or what have you for credit toward this program. --
http://www.ecoquestintl.com/dlrdown/website_forms/TechTradeUpProgram.pdf

Web Conferencing site -- http://www.ecoquest.hostacall.com/index.cfm
Review and sign up here.

Track your EcoQuest orders here. Just enter your invoice number -- UPS Package Tracking

EcoQuest Online Ordering -- https://www.ecoquestintl.com/cart/online-ordering.asp
For Dealers without a Website.

Get an EcoQuest Website -- http://www.ecoquestintl.com/dlrsup/getasitepg.htm

EcoQuest Opportunity Presentation --
http://www.ecoquestintl.com/opp/broadband/intro.html -- The same one that's on the mini-CD. Password=prosper

Fresh Air flash presentation --
http://www.ecoquestintl.com/pop_up/freshairflash.htm

Test graphics on both tests --
http://www.ecoquestintl.com/dlrdown/breezetesting.pdf

Fresh Air Owners Manual --
http://www.ecoquestintl.com/flash/freshair_om/FA_ownersManual.htm

The Enzyme Diet Movie Presentation --
http://www.ecoquestintl.com/pop_up/ecoted_movie.htm

The following six links allow you to send a prospect directly to these particular products (see each link). Once they arrive at Fresh Air (or whatever link you choose)

they can browse through the full product line.
http://www.ecoquestintl.com/dealer_products/fresh_air.asp
http://www.ecoquestintl.com/dealer_products/breeze.asp
http://www.ecoquestintl.com/dealer_products/flair.asp
http://www.ecoquestintl.com/dealer_products/freshair_spectrum.asp
http://www.ecoquestintl.com/dealer_products/freshair_togo.asp
http://www.ecoquestintl.com/dealer_products/freshair_buddy.asp

EcoQuest Preferred Customer (EPC) sign-up page -- Have sponsor's dealer number ready -- http://www.ecoquestintl.com/epcapp/epc-app-intro.asp

EPC Order Entry page -- Have EPC number ready -- https://www.ecoquestintl.com/cart/partnerOrderEntry.asp

Learn how to earn $10,000 per month -- EcoQuest: Class of 276

Email order form. This goes to Orderline by email -- EcoQuest Online Order Form

This is the latest orderline catalog -- OrderLine Catalog 02_04.pdf

Downloadable forms, such as Success Pack Application, Clip Financing Application, Product Trouble-Shooting Guide, etc. -- http://www.ecoquestintl.com/eqdownloadpg.asp

Loss of EcoQuest Warranty. Warning to people buying on eBay or illegal websites -- http://www.ecoquestintl.com/eqwarrantypg.htm

http://www.ecoquestintl.com/incentives/index_home.asp -- Contents of this link are presented below with some Bob Giddens improvements!

The Travel Dollar Program represents your own company-funded travel account for EcoQuest events, personal or recreational travel, or to create travel incentives for your group! The Travel Dollar Program was specifically targeted toward home air purifiers (not commercial units or other lines) to keep the company's focus strongly in our strongest area.

A company booklet called EcoQuest Incentives (US20129) contains this information and much more.

- Earned at the Dealer level and above on select products

- Travel Dollars assigned to a product are paid out 5 different ways:
    o Personal Sales Dollars
    o Matrix Dollars (spread equally 4 levels up)

- Upline Distributor Dollars
- Upline Manager Dollars
- Breakaway Manager Dollars

- Matrix Dollars are Earned at the Master Dealer level and above *** see note below (start with a Master Pack -- 3,000 QV -- to get there fastest!)

   *** The formulas used for dividing and assigning Travel Dollars are complex. They were programmed years ago and will probably never change. Not even Mike Jackson can tell you the exact formulas. Who cares? Do your work and enjoy Travel Dollar credits.

- Earnings per month increase dramatically as your network grows

- Typical earnings per month:
  - Master Dealer: $6 to $10
  - FS Distributor/MIT: $15 to $25
  - Manager: $300 to $1,000
  - Coordinating Manager: $90 to $120
  - Master Manager: $300 to $1,000

- Typical earnings per year:
  - Master Dealer: $70 to $120
  - FS Distributor/MIT: $150 to $300
  - Manager: $300 to $1,000
  - Coordinating Manager: $1,000 to $1,500
  - Master Manager: $3,000 to $15,000

## General Rules (PQV = Personal Qualifying Volume)

- Must be active to earn TD's each month
  - Master Dealer must have 200 PQV
  - Fast Start Dist. and MIT's must have 500 PQV (half of this can be earned by sponsoring one person with a cash Success Pack; all by sponsoring two with cash Success Packs)
  - Manager levels must have 1,000 PQV (half can be earned by sponsoring one person with a cash Success Pack; all by sponsoring two with cash Success Packs)
  - To be eligible to receive Travel Dollars for any given month, one of the following four requirements must be met, depending on rank:

- For all levels -- purchase of one of the following home purifiers:
  (can be purchased individually, in a CLIP, in a Sucess Pack)
  - Flair
  - Classic
  - Breeze
  - Fresh Air

- Managers only -- at least 250 CQV in Open-group Catalog Sales

- Managers only -- 4 or more legs of 1,000 GQV

http://www.chippynews.com/Company_Links.htm

3/20/2008

- FS Distributors thru Managers only -- personally sponsor a cash Success Pack (posted that month)

  - Earned only on select products -- Qualifying products are identified on the price list with an "*"
  - Designed to provide funds to attend EcoQuest events
  - Transferable to other Dealers
  - Can be used for personal travel as long as enough money is maintained in the account for yearly Leadership Convention
  - Can be used by Managers to create incentive programs within their organizations

 http://www.ecoquestintl.com/commercial_division/commercial_division.asp --

**EcoQuest's Certified Commercial Training program**... consists of two steps. First, a low cost Commercial Home Study Course. Written by RGF's President Ron Fink, this course is very informative about advanced oxidation processes for air, water, and food, with a focus on our RCI™ technology. The price for this course is $49. There is a test to be completed and graded. Upon passing, graduates will receive an Indoor Air Quality Specialist certificate and seal for use on their correspondence.

Secondly, after you complete and pass the Commercial Home Study Course, you can make application to attend one of our 2-day Commercial Certification Courses. We will send a questionnaire to be completed as to why you believe you should take the course. You will be called and we will chat briefly about your participation in commercial air. If we both agree this course would be beneficial, you will register for this $349 course. Completion will give you certification for being a Commercial RCI Certified Technician including mold training. You will receive a certificate and seal for use in your communications.

This training will not authorize you to do home inspections for insurance companies or any kind of mold abatement work. It simply gets you up to speed with our new technology as it applies to Commercial applications and important information about identifying and understanding indoor mold.

There is a place for Commercial Selling at EcoQuest... for those who are properly trained and have a background in HVAC work, engineering, manufacturing, or commercial sales of other product lines. It is our goal to provide especially well qualified people with good information, training and support.

You may go on-line and purchase the <u>Commercial Home Study Course</u>. The workbook will be mailed to you within 2 weeks.

Sincerely,

Rick Hill
Director of Commercial Marketing

Corporate Email Addresses --
http://www.chippynews.com/corporate_email_address.htm



Click to go *"All the way home" (page)*

# EXHIBIT "C"

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## TX 6-842-456

**Effective date of registration:**

May 20, 2008

## Title

**Title of Work:** ADVANCED OXIDATION TECHNOLOGY SELF-STUDY TRAINING PROGRAM

## Completion/Publication

**Year of Completion:** 2004

**Date of 1st Publication:** November 4, 2004    **Nation of 1st Publication:** United States

## Author

**Author:** RGF ENVIRONMENTAL GROUP, INC.

**Author Created:** REVISED TEXT FROM 2001 VERSION

**Work made for hire:** Yes

**Citizen of:** United States

**Anonymous:** No    **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** RGF Environmental Group, Inc.

3875 Fiscal Court, West Palm Beach, FL, 33404

## Limitation of copyright claim

**Material excluded from this claim:** 2001 Version of Work

**Previously registered:** No

**New material included in claim:** Added and Revised Text

## Certification

**Name:** Joseph R. Englander

**Date:** May 15, 2008

IPN#:

Registration #:   TX0006842456

Service Request #:   1-63962843

Shutts & Bowen LLP
Joseph R. Englander, Esq.
200 E. Broward Blvd., Suite 2100
Ft. Lauderdale, FL 33301

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, United States Code,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

# TX 6-842-497

**Effective date of
registration:**

May 20, 2008

## Title

**Title of Work:** ADVANCED OXIDATION TECHNOLOGY SELF-STUDY TRAINING PROGRAM

## Completion/Publication

**Year of Completion:** 2001

**Date of 1st Publication:** March 1, 2001     **Nation of 1st Publication:** United States

## Author

**Author:** RGF ENVIRONMENTAL GROUP, INC.

**Author Created:** ENTIRE TEXT

**Work made for hire:** Yes

**Citizen of:** Florida

**Anonymous:** No     **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** RGF Environmental Group, Inc

3875 Fiscal Court, West Palm Beach, FL 33404

## Limitation of copyright claim

**Previously registered:** No

## Certification

**Name:** Joseph R. Englander, authorized agent of RGF Environmental
Group, Inc

**Date:** May 15, 2008

**Correspondence:** Yes

**Copyright Office notes:** Regarding deposit  special relief granted under 37 CFR 202 20(d)

Page 1 of 1

IPN#:

Registration #:    TX0006842497

Service Request #:   1-63797213

Joseph R. Englander, Esq  / Shutts & Bowen LLP
200 E  Broward Boulevard, Suite 2100
Ft Lauderdale, FL 33301

# EXHIBIT "D"

**Ron Fink**

| | |
|---|---|
| **From:** | Allen Johnston [allenj@ecoquestintl.net] |
| **Sent:** | Wednesday, July 06, 2005 2:02 PM |
| **To:** | rfink@rgf.com |
| **Cc:** | Allen Johnston; wilmac@questevents.net |
| **Subject:** | Payments to you/RGF |

Ron,

We have three checks for you:

1. Royalty on Home Study Course
2. 50% of net on 2-day training
3. Reimbursement of expenses incurred by RGF for 2-day training

Somehow these slipped through the cracks as these checks should have been sent to you months ago.  My apologies.

Question......... Do all three need to be made out to RGF or should one or more be made out to Ron Fink?

Allen Johnston
VP, Technology Operations
310 T. Elmer Cox Dr
Greeneville, TN  37743
Phone: 423-798-6411
FAX:  423-638-9493

6/19/2008

℀ JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS

RGF ENVIRONMENTAL GROUP, INC.

**(b)** County of Residence of First Listed Plaintiff   Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Temple Fett Kearns, Esq., Shutts & Bowen LLP, 200 E. Broward Blvd., Suite 2100, Fort Lauderdale, FL 33301; Tel: 954-524-5505; Fax: 954-524-5506

### DEFENDANTS

ACTIV TEK ENVIRONMENTAL CORPORATION, ECOQUEST INTERNATIONAL, INC. and MICHAEL JACKSON

County of Residence of First Listed Defendant   Cumberland County, TN
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD ✔ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

✔ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

9:08 CV 80682 WPD-Rosenbaum

### III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☒ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

✔ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ✔ NO   b) Related Cases ☐ YES ✔ NO

JUDGE                                                      DOCKET NUMBER

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Copyright infringement under Copyright Act of 1976, 17 U.S.C. Section 101 et. seq.

LENGTH OF TRIAL via  **5**  days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ✔ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
_Temple Kearns_

DATE
6/20/08

FOR OFFICE USE ONLY

AMOUNT  350 00        RECEIPT #

IFP

543481